Darrell G. KIRCHNER, Plaintiff-Respondent,

v.

HARTFORD ACCIDENT & INDEMNITY COMPANY, a corporation, Defendant-Appellant.

No. 25172.

Kansas City Court of Appeals.

Missouri.

April 7, 1969.

Murphy & Kortenhof, Edward E. Murphy, Jr., St. Louis, for appellant.

Charles H. Howard, Hendren & Andrae, Sam C. Blair, Jefferson City, for respondent.

CROSS, Judge.

This is an action for a declaratory judgment brought by plaintiff Darrell G. Kirchner to determine the coverage provided by a "Comprehensive General-Automobile liability policy" issued by defendant Hartford Accident & Indemnity Company which insured him, (along with other coverages) against liability for damages to property caused by accident, and obligated Hartford to provide legal defense of suits and claims therefor.

This controversy arose when a certain building under construction, on which plaintiff had performed a part of the work, collapsed and fell. The building owners were paid for the loss by their insurer, Fidelity & Casualty Company of New York, which in turn, as subrogee, filed suit against plaintiff for damages caused by the collapse of the building. Defendant Hartford, relying upon a policy exclusion, refused to defend the suit and denied that the policy afforded coverage. This action for a declaratory judgment resulted.

Upon trial to the court, without a jury, judgment was rendered to the declaratory effect that the policy exclusion relied on by Hartford (hereinafter identified) has no application to the claim in question, that Hartford must afford coverage to plaintiff for the claims asserted against him in the suit brought by Fidelity & Casualty Co. and denied that action. Additionally, the judgment provided that plaintiff recover of defendant the sum of $750.-00 already expended for attorneys' fees and other items in defense of the suit. Hartford appealed originally to the Supreme Court but the cause was transferred to this court because it does not appear the amount presently in dispute exceeds $15,-000.00.

The facts here set out are undisputed, and were established by the testimony of plaintiff. Defendant produced no witnesses. Plaintiff, age 29, has been a structural steel worker since the age of 17, and is presently engaged in the business of steel erection, under the name "Kirchner Crane Rental." In September of 1965, he applied to Hartford's agent for insurance that would give him "complete coverage so I would be covered in any accident I would have in my line of business." Defendant issued him two policies, one for workmen's compensation insurance, the other a comprehensive liability insurance policy. Delivering the policies, the issuing agent told plaintiff "with these two policies I would have all the coverage I would need. I would be covered in every way." The comprehensive liability policy separately insured plaintiff against liability for bodily injury and property damage (1) caused by automobile accident and (2) caused by accident other than "automobile". Separate premiums were exacted for each classification. The policy describes plaintiff's business as "Steel Erectors" and the schedule of premiums for non-automobile liability coverage specifically identified plaintiff's operations as "Iron or Steel Erection". The property damage insuring clause in the comprehensive liability policy (non-automobile) reads as follows:

"Coverage D—Property Damage Liability—Except Automobile: To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."

The policy contains the further provision that defendant agrees to:

"II (a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiations and settlement of any claim or suit as it deems expedient."

The policy contains thirteen exclusions, inclusive of exclusion (j) which in pertinent part is here quoted:

"This policy does not apply: * * * (j) under coverage D, to injury to or destruction of * * * (3) * * * *property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control,* or, (4) any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the accident arises; * * *" (Italics supplied.)

Sometime after obtaining the above described policies, plaintiff entered into a subcontract with one L. N. Brown who, as general contractor, was constructing a building on the premises of Missouri Military Academy at Mexico, Missouri. Plaintiff's subcontract agreement was to perform the labor in erecting the steel used in the building. He was to furnish no materials. The building was of a stock design and was sold by Brown as agent of the American Building Company. That concern had prefabricated various parts for the building, including steel framework, insulation and metal "sheeting", for assemblage according to an accompanying "erection manual" and prepared plans. The steel parts were numbered and were to be bolted together according to the manual which directed "which piece fit in with which piece."

When plaintiff arrived at the job site (either on Monday, April 4th, or Wednesday, April 6th, 1966) the concrete foundation and footings were completed and the anchor bolts were already in. Plaintiff had nothing to do with any of that construction. He found all the steel materials stacked a short distance from the building, none of which he had supplied. Using Brown's truck to move the steel, plaintiff hauled it to the immediate building site to begin his work. After consulting with Brown and obtaining his approval as to the method of doing the work plaintiff proceeded to fasten the numbered steel frame members to the anchor bolts imbedded in the foundation, according to the manufacturer's erection manual and plans Brown had furnished him to guide the work. As the steel frame members were so erected they were tied together with steel "purlins" which served as cross-braces, and were additionally braced by guy cables temporarily attached to the frame and anchored to the bolts in the foundation. In doing this work plaintiff used a crew of employees varying from five to ten men. His equipment consisted of a hoisting crane, electric welder, cutting torch, cable, turnbuckles and small hand tools—the normal equipment used by steel workers. He had no office or desk at the work site, was present there only while the work was being done, and kept no watchman there after working hours. During progress of the work Brown was usually present and plaintiff advised and consulted with him from time to time as to the method pursued, whether it was satisfactory, and whether "he wanted to make any changes or do it a certain way." Plaintiff would have made any changes requested, but the work progressed to Brown's satisfaction.

Other work to be done by Brown under the general contract which did not involve plaintiff, (in addition to the foundation, footings and anchor bolts) included the construction of brick endwalls, block sidewalls; an asphalt floor, the electrical work, and the plumbing and lighting. While plaintiff and his employees were erecting the steel, plaintiff saw employees of Missouri Military Academy and maintenance men about the job site. He also saw plumbers, electricians and Brown's employees working on the job site. Brown was actively working to backfill inside and around the outside of the building as plaintiff was putting up the steel. On the job site were bricks, sand, lumber, plumbing

and electrical supplies, none of which belonged to plaintiff.

Plaintiff left work about 4:00 P.M. on Friday following the day he started the job. He had finished putting up all the steel frames and some of the purlins. The steel work was then approximately one-fourth done. The remaining work of installing the additional purlins, insulation and sheathing, he intended to resume the following week. Before leaving the job he talked to Brown and inquired as to his satisfaction with the work. Plaintiff narrates that conversation as follows: "Q On the Friday afternoon before you left, did you talk with Mr. Brown about how the work was going? A Yes, I did. Q And did you ask him if it looked all right, was satisfactorily braced, before you left the job? A Yes. We discussed this, and I asked him if he thought it needed any more guy cables or anything, and he said no, it looked real good. He accepted it and it was satisfactory. Q If he had told you any more cabling was needed, what would you have done? A I would have put it on. * * * Q * * Did you do whatever Mr. Brown wanted you to do? A Yes."

On Sunday night, April 10th, 1966, the building collapsed, apparently from the effect of a heavy and unusual windstorm in Mexico that weekend. The accident caused extensive damage to the building, inclusive of damage to the steel that had been erected, to the foundation and to the imbedded anchor bolts. Neither plaintiff nor any of his employees was present when the building collapsed and plaintiff has not been able to locate anybody who was present when the accident occurred. "At that time" nobody was claiming that plaintiff was responsible for the casualty. There had been damage to places "other than this building." Thereafter the concrete foundation was repaired, the anchor bolts were replaced and new steel was procured. Plaintiff then completed his job of erecting the steel part of the building and was paid for his services.

Promptly after discovering the damage to the building plaintiff contacted Hartford's agent, told him the extent of the damage and inquired what he should do. The agent told plaintiff "just to set tight until something else developed." On September 17th, 1966, plaintiff was served with summons and a copy of the petition filed by Fidelity and Casualty in the suit previously mentioned, containing allegations that the collapse of the building was caused by negligence on the part of defendant Kirchner (plaintiff here) resulting in loss and damage to the extent of $53,728.07, that Fidelity and Casualty had paid that sum to its insured, Missouri Military Academy, and thereby became subrogated to maintain the action against Kirchner. The petition prayed judgment accordingly. Kirchner took the suit papers immediately to Hartford's agent after being served. Hartford denied coverage by letter to plaintiff mailed October 13, 1966. Thereafter plaintiff Kirchner filed this action against Hartford praying declarations (among others) that Exclusion (j) is ambiguous and should be construed against Hartford, that plaintiff did not have care, custody or control of the building and was not exercising physical control over it, that Hartford must afford plaintiff liability coverage for the property damage claims and judgments, and must provide plaintiff a defense in the suit brought by Fidelity and Casualty Company (which has not been tried and is still pending).

Hartford's answer set up the affirmatively pleaded defense that the policy gave plaintiff no liability coverage as claimed "because of Exclusion 'j' of said policy providing that 'this policy does not apply to * * * property owned or occupied by or rented to the insured or * * * property used by the insured, or * * * property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control * * *', * * *"

The trial court's judgment (previously noted and to the declaratory effect that

Hartford must afford plaintiff coverage as claimed and provide a defense of the suit against him) is based on preliminary findings (1) that Exclusion (j) is ambiguous and should be construed against Hartford and (2) that Exclusion (j) does not apply because plaintiff did not have the requisite control over the building.

Hartford principally contends in this appeal that sub-paragraph (3) of Exclusion (j) is applicable under the facts in the case to exclude the coverage in question. Segregated from other provisions of Exclusion (j), not immediately pertinent, sub-paragraph (3) reads as follows:

"This policy does not apply: * * * (j) under coverage D, to injury to or destruction of * * * (3) * * * property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control, * * *"

In urging that the quoted clause is applicable to defeat the coverage afforded by the insuring clause, Hartford argues that the language of the exception is not ambiguous, as the trial court found it to be, and that, therefore, it should be enforced "in accordance with its plain meaning." Even if we were to accept that view of the exception and apply it as interpreted in its strictly literal sense, the evidence before us does not satisfy Hartford's burden to establish that Kirchner had the requisite "care, custody or control" of the building involved necessary to invoke application of the exception and relieve Hartford of its insuring agreement. Since our decision will rest on that basis, it will not be necessary to decide whether the exception is without ambiguity, as contended

by Hartford,[1] or whether, as plaintiff contends, the exception is latently ambiguous, therefore subject to resolution in favor of coverage.[2] Two factors of prime importance have lead us to these conclusions: (1) the nature and extent of *control* contemplated by the strictly interpreted literal wording of the exception itself and (2) the *time* as of which the exception speaks with reference to *when* the requisite control must be exercised, in order to make the exception effective.

■ *As to the factor of "control":* It is clear to us from the language employed in sub-paragraph (3) that the control of which it speaks must be *physical* in nature, whether exercised by the named insured, or employees and agents on his behalf. We are informed by the opinion in Elcar Mobile Homes, Inc. v. D. K. Baxter, Inc., 66 N.J.Super. 478, 169 A.2d 509,[3] that prior to 1955 the words "property as to which the insured for any purpose is exercising physical control" were not included in the standard policy exclusion clause now considered, but were added to the words "property in the care, custody or control of the insured" for the first time in the year mentioned. Commenting upon the effect of the added language, the court in the Elcar case said, " * * * (T)he addition of the quoted words ('property as to which the insured for any purpose is exercising physical control') is mere tautology * * *". We agree with that statement but further believe that the effect of incorporating the "physical control" language in the exception is to emphasize that the previously employed phrase meant "care, custody and control" *by the physical person* of insured, his agents or employees. Our view that sub-paragraph

---

1. Relying upon Northwestern Mutual Ins. Co. v. Haglund, Mo.App., 387 S.W.2d 230 and Moore v. M. F. A. Mutual Ins. Co., Mo.App., 422 S.W.2d 357, wherein, respectively, an automobile and a tractor (personal property) were conceded to be in the insured's sole care, custody and control; also cases from states other than Missouri.

2. In reliance upon The Aetna Casualty & Surety Co. v. Haas, Mo.Sup., 422 S.W.2d 316; also decisions from other jurisdictions.

3. On authority of an article in the January 1959 Insurance Law Journal page 7, entitled "Care, Custody or Control Exclusion" by F. D. Cook, Jr., an insurance company superintendent of claims.

(3) contemplates physical control is supported by Couch on Insurance, 2d, Vol. 12, Sec. 44:426, p. 12, where it is stated: "The great majority of the cases support the view that the exception clause relating to property in the care, custody, or control of the insured refers to possessory handling of the property as distinguished from proprietary control. Stated differently, the concept of 'control' in an exclusion of liability as to property in the 'care, custody, or control' of the insured refers only to the *physical* fact of possession and does not contemplate proprietary control or ownership." (Our emphasis.)

■ *As to the time of the control exercised:* It is well settled that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the alleged wrongful act was committed, but is the time *when the complaining party was actually damaged.* In 57 A.L.R.2d 1389, Annotation: Liability Insurance—Time of Incident, the following is stated: "In some of the cases the issue involved was whether an accident or injury occurs at the time the wrongful act is committed or at the time the damage complained of is actually sustained. It appears to be well settled that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged." (Citing cases.) Also see Nielson v. Travelers Indemnity Company, D.C., 174 F.Supp. 648; Export S. S. Corp. v. American Insurance Company, 106 F.2d 9, 2 Cir.; Peerless Insurance Company v. Clough, 105 N.H. 76, 193 A.2d 444 and Gibson v. Glens Falls Insurance Co., 241 S.C. 293, 128 S.E.2d 157.

The last cited case of Gibson v. Glens Falls Insurance Company, decided by the Supreme Court of South Carolina, effectively illustrates the necessity of *physical control* by the insured *at the time when the accident resulting in damage occurs.* Plaintiff Gibson was engaged in the swimming pool business and his operations were covered by a policy of manufacturers' and contractors' liability insurance issued by the defendant insurer. He entered into contract with one Pearson to clean a swimming pool located on the latter's property. The process involved gradually draining the pool and cleaning the walls with acid. After working one day plaintiff's employees left the job at about 4:00 P.M., at which time about half the water had been drained from the pool. When they returned the following morning it was discovered that sometime during their absence the pool had risen about fifteen inches out of its foundation. Plaintiff's employees knocked a hole in the bottom of the pool in an effort to restore it to its proper position, but were unable to do so. Thereafter Pearson made claim and filed a suit against plaintiff for damages to the pool. Plaintiff promptly notified defendant but defendant denied liability and refused to defend the suit. Subsequently plaintiff settled the property owner's damage suit and brought action against defendant to recover the settlement sum paid out, together with his attorneys' fees expended. The insurer defended solely on the ground that there was no coverage, relying upon a policy clause which excluded "property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control."— the identical language of Exclusion (j) (3) in the instant case. The trial court held the exclusion to be applicable and directed a verdict in defendant's favor. On appeal the Supreme Court reversed the judgment and directed entry of judgment in favor of Gibson, the insured. We consider the decision as directly in point and highly persuasive on the instant question. For that reason we quote pertinently from the opinion:

"Similar policy provisions to those here under consideration, containing care, custody and control exclusions, have been the subject of much litigation and judicial interpretation. * * * Such policy

provisions are the subject of an annotation in 62 A.L.R.2d 1242, where many of the cases are collected and analyzed. However, a review and analysis of the various interpretations placed upon such care, custody and control exclusions is unnecessary to a decision in this case. It is apparent from the decisions that the application of such a policy provision is dependent largely upon the facts and circumstances of each case.

The exclusion clause here involved clearly has reference to injury or damage *when* the property is under the care, custody or control of the insured. If at the time of the accident the property was not in the insured's care, custody or control, the exclusion would not apply, as the rights of the parties are fixed at the time of the loss. Crook v. Hartford Fire Insurance Co., 175 S.C. 42, 178 S.E. 254.

Under the facts of this case, the plaintiff was not exercising care, custody or control of the swimming pool at the time of the injury. The pool was located on the property of the owner, near his residence. The contract of the plaintiff provided only for the cleaning of the inside walls and floor of the pool, and he had access to it for that purpose only. At the time that the pool rose from its foundation, neither the plaintiff nor his employees were on the premises, having ceased their operations several hours before. It is true that the plaintiff intended to return the next day to finish cleaning the pool, but this fact only established his right to access to the pool to finish the cleaning and did not within itself place the pool in his care, custody or control. Care, custody or control of property implies more than the mere right of access to it, which was all that the plaintiff had at the time of the accidental loss.

The exclusion clause in question contemplates those situations where the insured exercises some sort of control over the property damaged. In this case, we do not reach the question of the extent of control necessary for its application, for the insured had no custody or control of the property at the time of the loss under any view of the matter.

Therefore, the lower court erred in directing a verdict for the defendant and in refusing to enter judgment for the plaintiff."

■ Applying the principles of law we have heretofore developed, and giving due weight to the decision in the Gibson case which is bottomed essentially on those principles, we find from all the facts in this case that plaintiff Kirchner had no care, custody or control of the building at the time it collapsed in any degree whatsoever—physical or any other kind. Such possibility had been precluded by the chronology of events prior to the accident. Kirchner and his workmen finished their week's work on the previous Friday afternoon and removed their physical presence from the building site and premises and never returned until the following Monday morning. Meanwhile, on the intervening Sunday night, the accident occurred in their absence. Those simple facts are not susceptible of any rationalizing that would permit us to conclude that Kirchner was exercising any physical control over the property when it collapsed. As to whether Kirchner had physical control over the building while actually performing labor upon it is a question we need not decide because, as the court commented in the Gibson case, "In this case, we do not reach the question of the extent of control necessary for its application."

We terminate the present discussion by brief reference to a New York case, General Mutual Insurance Company v. Wright, 7 Misc.2d 331, 161 N.Y.S.2d 974, which was decided on facts almost identical to the facts in this case. The insured there was also a steel erector working on a school building being constructed. During the night time (assumably in the absence of in-

**758**

sured) during the course of a violent storm, the partially erected steel was blown down, causing extensive damage, not only to the steel, but also to the masonry piers which supported it. The owner-school district was paid for the damage and the insurance company so doing sued the steel erector to recover as subrogee. General Mutual, which had insured him from liability, denied coverage on the basis of a policy clause excluding coverage for damage to property " * * * in the care, custody or control of the insured * * * ". Ruling that such defense was "specious", the court said:

"So far as the above cited clauses are concerned plaintiff's position may be summarized as follows: Until the work was completed Wright Engineering Co. had custody of the steel and this coverage was excluded by the first clause; that when it relinquished custody, the work was completed and coverage was excluded by the second clause. This argument is specious. It assumes that in order to work on something you must have custody of it. This is certainly not true of a large steel frame, furnished by someone else and being erected on still another party's property. Furthermore, it overlooks the fact that the action against Wright sought to recover for all the damage, not just the damage to the steel."

Hartford makes the additional contention that it is relieved of obligation under the policy by reason of the following quoted portion of sub-paragraph (4) of Exclusion (j), which excludes from coverage "any goods, products or containers thereof manufactured, sold, handled or distributed * * * or work completed by or for the named insured, out of which the accident arises; * * * ". There is substantial doubt that Hartford has timely utilized sub-paragraph (4) as a ground for denying coverage. Nonetheless we have examined the question, but discover that it has no merit. Our ruling is controlled by Kissel v. Aetna Casualty & Surety Com-

pany, Mo.App., 380 S.W.2d 497, approved in 1968 by the Supreme Court, en banc, in Rafiner Elevator Works, Inc. v. Michigan Mutual Liability Company, 392 S.W. 2d 240. The court held in the Kissel case that an exclusion clause identical with Exclusion (j) (4) was not effective to defeat property damage liability coverage extended by a comprehensive liability policy issued to a contractor when it was apparent that his operations were limited to the performance of services in building construction, that he neither manufactured, sold, handled or distributed any products, and that he purchased the policy to protect himself from claims arising out of the performance of his work and services. Following Kissel, we likewise rule that Exclusion (j) (4) has no effect.

The judgment is affirmed.

All concur.