**FARMLAND INDUSTRIES, INC., Plaintiff,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Pennsylvania, et al., Defendants.**

No. 02–4135–JAR.

United States District Court, D. Kansas.

March 3, 2005.

Lee M. Smithyman, Smithyman & Zakoura, Chtd., Overland Park, KS, for Plaintiff.

Christopher F. Burger, Peter K. Curran, Stevens & Brand, L.L.P., Lawrence, KS, Ethan V. Torrey, Matthew M Burke, Ropes & Gray, Boston, MA, for Defendants.

### MEMORANDUM ORDER AND OPINION GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION FOR HEARING

ROBINSON, District Judge.

This matter comes before the Court on defendants' Motion for Summary Judgment (Doc. 49). Defendants National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Qatar General Insurance and Reinsurance Company; Certain Underwriters at Lloyd's of London;

Gerling Konzern Allgemeine Versicherungs–AG; and Allianz Insurance Company (collectively "the Insurers") seek summary judgment on the discrete issue of quantification of plaintiff Farmland Industries, Inc.'s ("Farmland") damages. In turn, Farmland has requested oral argument on the Insurers' motion (Doc. 67). For the reasons set forth below, the Insurer's Motion for Summary Judgment is granted, and Farmland's Motion for Oral Argument is denied.[1]

## I. Uncontroverted Facts [2]

Prior to April 5, 2000, Mountain Energy Corporation ("MEC") purchased from Terra Nitrogen Corporation 1.5 bcf of physical natural gas (the "Terra gas"). At that time, the Terra gas was located in a storage facility owned by Manchester Gas Storage, Inc. ("Manchester") and managed by MEC. On or about April 5, 2000, Farmland entered into a transaction with MEC for .5 bcf of the Terra gas. At the same time as the Farmland transaction, MEC entered into a virtually identical transaction with Tenaska Marketing Ventures ("Tenaska") for .5 bcf of the Terra gas.

Sometime in early April of 2000, MEC committed to withdraw 635,000 MMBtu of the Terra gas on a ratable basis over the month of April for sale to its customers in the Kansas City area. MEC's Kansas City supply customers received this gas on a ratable basis of 20,000 MMBtu per day,

beginning on April 1. On April 17, 2000, Manchester advised MEC that it would not permit MEC to remove the Terra gas from the storage facility. After Manchester's refusal, MEC sold the remainder of the Terra gas to Anadarko Energy Services Company ("Anadarko") in May 2000.

Section I.4B of the insurance policy governing this dispute ("the Policy") titled "Basis of Settlement" provides:

> In the event of claim for loss to crude petroleum, the basis of settlement shall be the posted market price thereof on the date of the loss, plus the gathering and transportation charges to include also, where crude petroleum is delivered in railroad tankers, cars, tank ships or tank trucks, loading and unloading charges, if incurred, plus earned freight revenue, and *in the event of claim for loss or damage to other petroleum products, the basis of settlement shall be the market value thereof at the time and place of loss.*[3]

The Inside FERC WNG Index provides the market value of natural gas. According to the Inside FERC WNG Index, the market value of natural gas was $2.79/MMBtu on April 30, 2000, and $2.94/MMBtu on May 31, 2000.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to in-

---

**1.** Pursuant to District of Kansas Local Rule 7.2, "requests for oral argument on motions shall be granted only at the discretion of the court.... Otherwise, motions shall be submitted and determined on the written memoranda of the parties." In this instance, oral argument on the Motion for Summary Judgment is unnecessary, particularly considering that Farmland was granted leave to file a sur-reply, ostensibly to respond to arguments made for the first time in the Insurers' reply brief. Moreover, the Court notes that to the extent Farmland's sur-reply rebuts arguments made by the Insurers in their original sum-

mary judgment memorandum, the sur-reply goes beyond the purpose for which it was allowed and constitutes an impermissible "second bite at the apple."

**2.** Because a detailed factual account was set forth in the Court's *Memorandum Order Denying Motion for Summary Judgment and Denying Cross Motion for Summary Judgment* (Doc. 43), the Court includes only those facts relevant to the issue of quantification of damages.

**3.** Emphasis added.

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[4] The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[5] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[6]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case.[7] Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[8] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial."[9] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[10] The Court must consider the rec-ord in the light most favorable to the nonmoving party.[11] The Court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[12]

### III. Discussion

The Insurers argue that summary judgment is appropriate because under the Policy, the basis of settlement for any loss of petroleum products other than crude petroleum is the "market value thereof at the time and place of loss." Since the loss took place no later than the end of April 2000 as to 0.135 bcf and no later than the end of May 2000 as to 0.365 bcf, the Insurers' assert that Farmland's loss should be valued at $2.79/MMBtu and $2.94/MMBtu, respectively. In response, Farmland asserts that the Policy valued the gas not at the time of loss, but instead at the time of replacement, and thus its loss should be valued at $5.19/MMBtu, the value of natural gas in October 2000. Additionally, Farmland urges that it was not "actually damaged" until October 2000, when the loss was discovered, investigated and verified, such that the loss should be valued according to October 2000 market prices.

### A. Basis for Settlement under the Policy

■ The parties disagree over which provision of the Policy provides the mea-

---

**4.** Fed.R.Civ.P. 56(c).

**5.** *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**6.** *Id.* at 251–52, 106 S.Ct. 2505.

**7.** *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**8.** *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

**9.** *Id.*

**10.** *See id.*

**11.** *See Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

**12.** *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

sure of damages for lost natural gas. The Insurers contend that section I.4B of the Policy pertaining to "petroleum products other than crude petroleum" provides the basis for settlement, while Farmland contends that its natural gas loss falls under the valuations of loss for "real and personal property," or "raw stock, supplies or other merchandise not manufactured by the Insured." Alternatively, Farmland urges that the Policy provisions are ambiguous.

"Rules governing the interpretation of insurance policies are well settled."[13] In interpreting an insurance contract, courts "read the contract as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written."[14] Language used in an insurance contract is given its plain and ordinary meaning.[15] Plain or ordinary meaning is the meaning that the average layperson would understand, as determined by consulting standard English language dictionaries.[16] Where insurance contracts are written in plain and unambiguous terms, the court must enforce the policy according to those terms,[17] and rules of construction are inapplicable.[18]

The Court may not distort unambiguous policy language to create an ambiguity.[19] Nor may a court "use its inventive powers to ... rewrite a policy to provide coverage for which the parties never contracted, absent a statute or public policy requiring coverage."[20]

In this case, the Policy unambiguously provides for a measure of damages for lost natural gas in section I.4B. Section I.4B states that "in the event of claim for loss or damage to other petroleum products [other than crude], the basis of settlement shall be the market value thereof at the time and place of the loss." Petroleum is commonly defined as: "[a] naturally occurring complex liquid hydrocarbon which after distillation yields combustible fuels, petrochemicals, and lubricants; can be gaseous (*natural gas*), liquid (crude oil, crude petroleum), solid (asphalt, tar, bitumen), or a combination of states."[21] Thus, according "petroleum" its plain and ordinary meaning, natural gas is clearly a petroleum product, making the appropriate measure of damages the market value of the natural gas at the time and place of the loss.

**13.** *Shahan v. Shahan*, 988 S.W.2d 529, 535 (Mo.1999) (en banc).

**14.** *Mo. Employers Mut. Ins. Co. v. Nichols*, 149 S.W.3d 617, 625 (Mo.App.2004).

**15.** *Id.; Farmland Indus. Inc. v. Republic Ins. Co.*, 941 S.W.2d 505, 508 (Mo.1997) (en banc).

**16.** *Shahan*, 988 S.W.2d at 535.

**17.** *Rice v. Fire Ins. Exch.*, 946 S.W.2d 40, 42 (Mo.App.1997).

**18.** *Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co.*, 62 S.W.3d 633, 637 (Mo.App. 2001).

**19.** *Am. Motorists Ins. Co. v. Moore*, 970 S.W.2d 876, 878 (Mo.App.1998) (citing *Krom-*

*bach v. Mayflower Ins. Co.*, 827 S.W.2d 208, 210 (Mo.1992) (en banc)).

**20.** *Lang v. Nationwide Mut. Fire Ins. Co.*, 970 S.W.2d 828, 830 (Mo.App.1998) (citing *Rodriguez v. Gen. Accident Ins. Co.*, 808 S.W.2d 379, 382 (Mo.1991) (en banc)).

**21.** McGraw-Hill Dictionary of Scientific and Technical Terms 1569 (6th ed.2003) (emphasis added); *see also* The American Heritage College Dictionary 1041 (4th ed.2002) (defining petroleum as: "[a] thick, flammable, yellow-to-black mixture of gaseous, liquid, and solid hydrocarbons that occurs naturally beneath the earth's surface, can be separated into fractions including natural gas, gasoline, naphtha, kerosene, fuel and lubricating oils, paraffin wax, and asphalt and is used as raw material for a wide variety of derivative products.").

Moreover, the Policy itself demonstrates that natural gas was a "petroleum product," as that term is used in section I.4B. In an exclusion section of the Policy, the parties agreed that: "[t]his section does not cover ... [s]ubterranean strata except coverage is provided for *crude petroleum and its products including but not limited to natural gas* and other minerals while stored in strata of any nature after initial recovery above ground unless otherwise provided under this policy." [22] The Court therefore concludes that, based upon a plain reading of the four corners of the Policy, natural gas is a petroleum product.

Even though natural gas falls squarely within the purview of petroleum products covered in section I.4B of the Policy, Farmland urges that its lost natural gas must be valued according to the personal property or raw stock Policy provisions, both of which measure damages based upon the cost of replacement. Such a valuation, according to Farmland, is necessary as it furthers "the overarching intent of the Basis of Settlement provisions ... to fully reimburse the insured through cost of replacement." Thus, Farmland contends that the market value basis of settlement for damages to petroleum products, such as natural gas, is inconsistent with the Policy as a whole and is contrary to the stated intention to fully indemnify the insured.

■ The presence of a different damage valuation for losses to petroleum products, as compared with other risks insured under the Policy, does not aid Farmland's proffered contract interpretation. "In construing a contract, [courts] assume that the use of different language to define different obligations was deliberate and accompanied by an intention to convey different meanings rather than the same one." [23] Here, the presence of both a valuation based upon the market value at the time of loss and the cost of replacement merely suggests that the parties contracted for different measures of damages depending upon the type of risk insured. In the case of a petroleum product like natural gas, the parties agreed that the basis of settlement would be the market value at the time and place of the loss, not the cost of replacement. Only by impermissibly rewriting the Policy to provide additional coverage could the Court find that Farmland's damages should be measured by the cost of replacement natural gas.[24]

■ Farmland also implores the Court to value its damages on a replacement cost basis under fraud, bailment, or conversion law. Damages pursuant to an insurance contract are not analogous to damages in tort.[25] In this case, it is the express contractual provisions, not a tort theory, which provides the appropriate damage valuation. Thus, notwithstanding the damage valuation under fraud, bailment or

---

**22.** Emphasis added.

**23.** *Mo. Pac. R. Co. v. Winburn Tile Mfg. Co.,* 461 F.2d 984, 988–89 (8th Cir.1972); *Taracorp, Inc. v. NL Indus., Inc.,* 73 F.3d 738, 744–45 (7th Cir.1996) ("[W]e assume that the same words have the same meaning ... and that the choice of substantially different words to address analogous issues signals a different approach.").

**24.** The Court may not "use its inventive powers to ... rewrite a policy to provide coverage for which the parties never contracted, absent

a statute or public policy requiring coverage." *Lang,* 970 S.W.2d at 830 (citation omitted).

**25.** *See Self Towing, Inc. v. Brown Marine Servs., Inc.,* 837 F.2d 1501, 1506 (11th Cir. 1988) (noting that the tort law standard for a damage award difference from the insurance law standard); *Arnold v. Liberty Mut. Ins. Co.,* 469 So.2d 1155, 1157–58 (La.App.1985) (rejecting authorities cited by defendant because "all such cases ... were dealing with tort claims in which the measure of damages is different from that established by the Insurance Code").

conversion law, the basis of settlement, as set forth in the Policy, is the market value at the time and place of the loss.

 In yet another attempt to avoid the express contractual provisions, Farmland urges that it is inequitable to value its natural gas as of the time of the loss, rather than at the time of replacement, because natural gas is subject to price fluctuations. In *Hartford Fire Insurance Co. v. Producer's Gin of Hernando, Inc.,*[26] the insured sought indemnity for destroyed cotton under an insurance policy, which required indemnification for the "actual cash value of the property at the time of the loss."[27] The price of cotton like the price of natural gas fluctuated over time. In holding that the insurance policy fixed liability as of the date of loss, the court stated:

> Had the cotton decreased in value from 30 cents per pound from [the] time of sale to 20 cents per pound at [the] time of loss, defendants could have logically argued that their liability was limited to the terms of the policies: cash value at the time of the loss. The policy terms also govern the liability of defendants in the event of an increase in the value of the cotton from [the] time of sale to [the] time of loss: cash value at the time of loss.[28]

Similarly, in this case, the insurance policy provides that the basis of settlement for petroleum products is the market value at the *time of loss,* regardless of whether the price of natural gas increases or decreases after the time of loss. To allow Farmland to recover under a replacement cost valuation simply because the price of natural gas is fluid, when the Policy expressly provides for a market value at the time of loss basis of settlement, would be truly inequitable.

Finally, the Court observes that Farmland has previously admitted that the basis of settlement set forth in section I.4B of the Policy governs this dispute. In its amended complaint, Farmland quantified its damages and stated: "[t]his sum constituted the market value of the natural gas at the time and place of the loss, as that loss is computed in paragraph I(4) of the ALL RISK POLICY."[29] As a general rule, a party is bound by allegations or admissions of fact in his own pleadings.[30] By parroting the language of section I.4B and by expressly alleging that the basis of settlement is the market value at the time and place of the loss, Farmland is estopped from now denying that section I.4B provides the appropriate damage valuation.

---

**26.** 326 So.2d 807 (Miss.1976).

**27.** *Id.* at 810.

**28.** *Id.*

**29.** The Court notes that Farmland's original complaint, included this identical statement, but cited more precisely to section I(4)(B) of the Policy, rather than to section I(4) generally. Farmland subsequently sought leave to amend its complaint to: "(1) Reflect Farmland's bankruptcy, change of name to Reorganized FLI, Inc., and transfer of its cause of action to J.P. Morgan Trust Company, N.A., the Liquidating Trustee of FI Liquidating Trust; and (2) Substitute reference to V.A.M.S. § 375.420 and V.A.M.S. § 408.020 for their corresponding Kansas Statutes." (Doc. 53). Magistrate Judge Humphreys granted Farmland's motion to amend on these two grounds. *See* Doc. 61. In an apparent attempt to amend its damages valuation, Farmland now cites only to section I(4). Farmland, however, was not granted leave to amend its request for damages. Thus, this amendment is unauthorized and is hereby stricken. *See Ambrose Packaging, Inc. v. Flexsol Packaging Corp.,* No. 04–2162, 2004 WL 2075457, at *3 (D.Kan. Sept. 16, 2004) (striking an unauthorized amendment).

**30.** *E.g., Buatte v. Gencare Health Sys., Inc.,* 939 S.W.2d 440, 443 (Mo.App.1996).

## B. Time of Loss

Pursuant to the Policy, the basis of settlement for Farmland's lost natural gas is the market value at the time and place of the loss. The Insurers assert that the time of loss is April and May 2000. Farmland, on the other hand, urges that the time of loss is October 2000—the date it was actually damaged and discovered the loss. Lastly, Farmland asserts that it is customary in the industry to value lost natural gas after an investigation of the loss. Missouri courts look to injury or damage in fact to determine the time of any alleged loss.[31] The time of the occurrence of an event within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged.[32]

Farmland argues that it was not actually damaged until October 2000, when it was "denied its contractual entitlement" to natural gas by MEC's failure to deliver the gas. To support this contention, Farmland directs the Court to the Insurers' arguments in a prior summary judgment brief, in which the Insurers argued that the gas was not covered by the Policy because Farmland possessed only a contract right to delivery of the gas, rather than physical natural gas itself. In response, Farmland characterized the Insurers assertion as "remarkable" and emphasized that it purchased gas in April, that the gas was present in the facility and that the agreement with MEC was merely "a storage commitment." The Court, in its Order, agreed with Farmland and concluded that "the contracting parties' intent demonstrates that Farmland purchased 500,000 MMBtu of existing physical natural gas from MEC, not a bare contract right to later delivery." This ruling is law of the case and Farmland may not now argue that it possessed only a contract right to delivery of the gas.[33] Because Farmland owned physically existing gas in April, it was actually damaged when its gas was converted by MEC.

The undisputed facts demonstrate that the time of loss of Farmland's natural gas was April and May 2000. Some of Farmland's gas was converted in April 2000 and all of its gas was lost by the end of May 2000. The relevant chronology based upon the undisputed facts is as follows:

- Prior to April 5, 2000 — MEC purchased 1.5 bcf of gas from Terra

- Early April 2000 — MEC committed to withdraw 635,000 MMBtu of the Terra gas for sale to Kansas City customers

- April 5, 2000 — Farmland sold .5 bcf of the Terra gas to Farmland

- April 5, 2000 — Farmland sold .5 bcf of the Terra gas to Tenaska

- April 1–17, 2000 — Farmland sold the Terra gas to Kansas City customers on a ratable basis of 20,000 MMBtu/day

- May 2000 — MEC sold the remainder of the Terra gas to Anadarko

It is clear that by May 2000 all of the Terra gas had been converted by MEC.[34]

---

**31.** *See Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.,* 672 F.Supp. 1, 3 (D.D.C. 1986) (noting that Missouri law applies an injury in fact trigger).

**32.** *Am. Family Mut. Ins. Co. v. McMullin,* 869 S.W.2d 862, 864 (Mo.App.1994) (citing *Kirchner v. Hartford Accident & Indem. Co.,* 440 S.W.2d 751, 756 (Mo.App.1969)).

**33.** *See McIlravy v. Kerr–McGee Coal Corp.,* 204 F.3d 1031, 1034 (10th Cir.2000) (quoting *United States v. Monsisvais,* 946 F.2d 114, 115 (10th Cir.1991)) ("[T]he law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'").

**34.** Even Farmland previously argued that its gas was lost in May 2000. In its summary judgment reply brief, Farmland stated:

The parties agree that MEC sold approximately 635,000 of this gas to Kansas City

The only fact in dispute is how much gas MEC actually delivered to Kansas City customers in April 2000. Farmland argues that the transfers to Kansas City customers stopped on April 17, 2000, when Manchester advised MEC that it would not permit MEC to remove the Terra gas from the facility. The Insurers agree that MEC transferred gas to the Kansas City customers from April 1–17, 2000, but additionally assert that the transfers continued until April 30, such that the entire 635,000 MMBtu of Terra gas was transferred to Kansas City customers by the end of April. Because this fact is controverted, the Court cannot determine the exact amount of natural gas that was lost in April 2000 versus the amount lost in May 2000. The Court concludes, however, that all of Farmland's gas was lost no later than May 2000. Because the Policy provides that the basis of settlement for natural gas is the market value at the time and place of the loss, and because the parties agree that the Inside FERC WNG Index provides the applicable market value, the loss will be valued at $2.79/MMBtu for losses in April and $2.94/MMBtu for losses in May.

Farmland argues that the "time of loss" under the Policy provision did not occur until October 2000, when Farmland discovered, investigated and verified the loss through an audit.[35] The Policy does not provide for a basis of settlement as of the *discovery of the loss*, but instead, provides that the measure of damages is the *market value at the time and place of the loss*. Like parties to any written contract, parties to an insurance policy are bound by the policy's terms.[36] Thus, Farmland is bound by the basis of settlement set forth in the Policy and is entitled only to the market value of its natural gas at the time the gas was lost. As the Court has already discussed, the time of loss was April and May 2000.

■ In another attempt to value its lost gas at October 2000 prices, Farmland asserts, without supporting authority, that it is common practice for insurance companies to value the loss of stored fungible goods after notice, investigation and valuation of the amount of property lost. In essence, Farmland asks the Court to look to industry custom to explain the parties' intent. Only when an ambiguity exists, however, may a court resort to extrinsic evidence, such as industry custom, to show intent.[37] Here, the Policy provision mandating a market value at the time of loss basis of settlement is not ambiguous. Indeed, Farmland does not contend that this provision is ambiguous. The absence of an ambiguity, therefore, renders it unnecessary and improper to look to the custom and usage of the industry as Farmland urges.[38]

**IT IS THEREFORE ORDERED BY THE COURT** that the Insurer's Motion for Summary Judgment on Quantification (Doc. 49) is GRANTED.

---

area customers in April of 2000.... The parties further agree that the remaining Terra natural gas was subsequently sold to Anadarko in May of 2000. Given the inherent ambiguities of this fungible, commingled product, *this is the best "date of loss" available.* Sale by a bailee constitutes theft, which is covered by this ALL RISK insurance [policy].

35. The Court notes that, in an apparent attempt to prevent its claim from falling within the exclusion for "shortage[s] revealed by au-dit of inventory," Farmland previously argued that it discovered the shortage on September 27, 2000, when Rod Donovan informed Farmland that MEC could not deliver the gas, not in October 2000.

36. *Brattin Ins. Agency, Inc. v. Triple S. Properties, Inc.*, 77 S.W.3d 687, 688(Mo.App.2002)

37. *Clayton Brokerage Co. v. Raleigh*, 679 S.W.2d 376, 378 (Mo.App.1984).

38. *See id.*

**IT IS FURTHER ORDERED BY THE COURT** that Farmland's Motion for Oral Argument (Doc. 67) is DENIED.

IT IS SO ORDERED.