# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2699

_____

| | | |
|---|---|---|
| Michigan Millers Mutual Insurance Company, | * <br> * <br> * | |
| Plaintiff - Appellee, | * <br> * | |
| v. | * <br> * | Appeal from the United States <br> District Court for the |
| DG&G Company, Inc., | * <br> * | Eastern District of Missouri. |
| Defendant - Appellant, | * | |

_____

Submitted: January 16, 2009
Filed: July 1, 2009

_____

Before LOKEN, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

LOKEN, Chief Judge.

DG&G Company operates a cotton gin in Parma, Missouri. After it ginned some 50,000 bales for eastern Missouri producers in the fall of 2005, and delivered the cotton to warehouses operated by Federal Compress & Warehouse Company, cotton brokers and purchasers asserted claims against DG&G for losses caused by mold, mildew, and hard spots found in many bales. DG&G's liability and property insurer, Michigan Millers Mutual Insurance Company, commenced this action seeking a declaratory judgment that it has no duty to defend or indemnify DG&G for these claims. In separate orders resolving coverage issues under liability and property

policies, the district court[1] granted summary judgment in favor of Michigan Millers. DG&G appeals both rulings. Reviewing the grant of summary judgment and the interpretation of the policies *de novo*, we affirm. Stan Koch & Sons Trucking, Inc. v. Great West Cas. Co., 517 F.3d 1032, 1039 (8th Cir. 2008) (standard of review).

## I. Background

When DG&G received the cotton from various producers for ginning, the producers retained title, using the cotton as collateral for Commodity Credit Corporation (CCC) loans. DG&G dried and then remoisturized the cotton during the ginning process, packaged the finished bales in polyethylene bags supplied by Federal Compress, and delivered the bales to Federal Compress warehouses. Federal Compress employees testified that the cotton showed no damage when it arrived at the warehouses. It was "great-looking" and "pretty, white, [and] clean." Federal Compress issued negotiable warehouse receipts to the producers, who sold the bales to cotton brokers, subject to the CCC loans. The brokers planned to redeem the loans and sell the bales to mills.

In late December 2005, Federal Compress employees noticed mold, mildew, and hardened spots on a substantial number of bales. A cotton broker's employee inspected the bales and observed "obvious moisture and water." Moisture testing at both warehouses revealed that DG&G-ginned bales had an average moisture content of 12.6-12.8%, well in excess of the industry standard. The Memphis Cotton Exchange's Trading Rules provide that "unmerchantable cotton" includes cotton "containing moisture in excess of 7.5%." DG&G acknowledged that the National Cotton Council of America recommends no more than 7.5% moisture. An expert in

---

[1]The HONORABLE THOMAS C. MUMMERT III, United States Magistrate Judge for the Eastern District of Missouri, who conducted the proceedings with the consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

the lawsuit underlying this declaratory judgment action testified that the damaged cotton was "unmerchantable" due to its high moisture content because, in his experience, a moisture level in excess of 9-10% renders cotton unmerchantable.

In late January 2006, DG&G learned that the CCC planned to call the loans because the damaged cotton did not meet federal loan requirements. This action could bar producers from future participation in the CCC loan program. Several cotton brokers who held title to the bales also demanded payment from DG&G. When Michigan Millers declined DG&G's request to pay, DG&G paid $3.4 million to redeem the damaged cotton from the loan program and another $2.1 million to settle the claims of three cotton brokers.

Meanwhile, two other brokers, Staple Cotton Cooperative Association and Beltwide Cotton Cooperative, filed the underlying lawsuit in the Eastern District of Missouri, naming as defendants DG&G, Federal Compress, and the individual producers. As relevant here, plaintiffs alleged that DG&G added excess moisture during ginning that rendered the cotton unmerchantable. DG&G joined as third-party defendants the suppliers of the device DG&G used to apply water during the ginning process (the Lewis Moisture System) and the device that measured the amount of water being applied (the Vomax device). DG&G also asserted a cross-claim against Federal Compress, alleging that it supplied packaging bags unsuitable for moisture-enhanced cotton. Michigan Millers agreed to defend DG&G under a reservation of rights and filed this suit for declaratory relief. DG&G counterclaimed for breach of contract and vexatious refusal to pay both the claims asserted in the underlying lawsuit and DG&G's expenses in settling the other claims.

Michigan Millers insured DG&G under a Commercial Agribusiness Policy that included a variety of coverages in multiple policies. Three policies are at issue -- Commercial General ("CGL") and Umbrella liability policies, and an Agribusiness Property and Income policy (the "Agribusiness Policy"). The district court initially ruled that Michigan Millers has no duty to defend or indemnify under the CGL and

Umbrella liability policies. Mich. Millers Mut. Ins. Co. v. DG&G Co. (Mich. Millers I), 2007 WL 3120048 (E.D. Mo. Oct. 23, 2007). The court later ruled that Michigan Millers has no duty to defend or indemnify under the Agribusiness Policy and dismissed DG&G's counterclaims as moot. Mich. Millers Mut. Ins. Co. v. DG&G Co. (Mich. Millers II), 2008 WL 1766786 (E.D. Mo. Apr. 14, 2008). DG&G appeals both summary judgment rulings and the dismissal of its counterclaims, arguing that Michigan Millers has a duty to indemnify under each policy.

## II. The Liability Policies

As relevant here, Coverage A of the CGL Policy obligated Michigan Millers to pay damages that DG&G is "legally obligated to pay" because of both "property damage" and a covered "occurrence." DG&G claims property damage to the cotton and a covered occurrence, which the policy defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy defined "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

The district court held that "property damage" under this definition requires proof of some physical injury to tangible property. See Esicorp, Inc. v. Liberty Mut. Ins. Co., 266 F.3d 859, 862-63 (8th Cir. 2001) (applying Missouri law to identical policy term). Rejecting Michigan Millers' argument to the contrary, the court concluded that damage to the cotton from excess moisture is "property damage," like the damage to tomato plants in Ferrell v. West Bend Mut. Ins. Co., 393 F.3d 786, 795 (8th Cir. 2005). The court further concluded that plaintiffs in the underlying lawsuit

-4-

alleged an "occurrence" -- DG&G's alleged negligence in adding excess water to the cotton during the ginning and packing process. Neither party appeals these rulings.

Although the district court found sufficient evidence of property damage and an occurrence, it granted summary judgment in favor of Michigan Millers based upon the CGL policy's exclusion for "'[p]roperty damage' to . . . [p]ersonal property in the care, custody or control of the insured." The court explained:

> In Opies Milk Haulers, Inc. [v. Twin City Fire Ins. Co., 755 S.W.2d 300 (Mo. App. 1988)], . . . the damage at issue occurred when fructose was loaded into a contaminated tanker. . . . The court held that there could be no dispute that when loaded into the tanker, the fructose was in the care, custody or control of the insured. . . . Similarly, *if* DG&G is liable to the [plaintiffs], it is because the cotton was damaged when it was in DG&G's care, custody, or control. "[T]he decisive factor is control of the [cotton] at the time of the act which ma[kes] [DG&G] liable for its loss . . . ." Harry Winston, Inc. [v. Travelers Indem. Co., 366 F. Supp. 988, 991 (E.D. Mo. 1973)] (alterations added). If the cotton was damaged after it left the [gin], DG&G is not liable.

Mich. Millers I, 2007 WL 3120048, at *4-5.

On appeal, DG&G argues that the district court made an error of fact and an error of law which require reversing the grant of summary judgment on its CGL policy claim. The alleged error of fact is that the property damage occurred, not at DG&G's gin as the district court concluded, but at the Federal Compress warehouses when rot, mildew, and hardening were discovered some months later. The alleged error of law was in relying on the above-quoted portion of Harry Winston, a decision which "runs directly counter to well settled Missouri case law." DG&G contends the correct principle was stated in Kirchner v. Hartford Accident & Indem. Co., 440 S.W.2d 751, 756 (Mo. App. 1969): "the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the alleged wrongful act was committed, but is the time *when the complaining party was actually damaged*."

(Emphasis in original.) Here, DG&G argues, plaintiffs in the underlying lawsuit were damaged when the rot and mildew appeared, not while the cotton was in DG&G's care, custody, and control.

We will address the legal issue first because it is something of a red herring. Harry Winston involved a customer who took a valuable piece of jewelry home for his wife's approval. The wife did not approve, the customer mailed the jewelry back to the jeweler, and the jewelry was lost in the mail. The customer claimed the loss was covered by liability provisions in his homeowner's policy. Applying Missouri law, the federal court rejected the claim. Noting that the purpose of the "care, custody or control" exclusion was to exclude "liability on account of damage to property held under bailment," the court concluded either that the loss was not "property damage," or that the property damage occurred while the customer as bailee had care, custody, and control of the jewelry. 366 F. Supp. at 990-91 (internal quotation omitted).

Kirchner involved an entirely different coverage claim. In that case, a contractor working on a building went home for the weekend. A storm struck Sunday night, the structure collapsed, and the contractor was sued for negligence contributing to the collapse. The court held that the "care, custody or control" exclusion did not apply because the contractor was absent when the building collapsed, even if his prior negligence contributed to the collapse. 440 S.W.2d at 757-58. In Kirchner, the court simply ruled that the "occurrence" causing property damage was the storm, not any prior negligence by the contractor.

The Missouri Court of Appeals opinion in Opies is closer factually to this case. The insured in Opies negligently cleaned a bulk liquid tanker after it carried liquid egg whites and then dispatched the tanker to carry a load of liquid fructose. When the fructose reached its destinations, egg white contamination was discovered and Opies was sued. The court, quoting Kirchner, held that "the occurrence covered by the liability policy took place at the time the fructose was loaded into the [contaminated] tanker." 755 S.W.2d at 303. As the tanker was then in the care, custody, or control

of the insured, property damage to the fructose was excluded. However, additional property damage caused when the contaminated fructose was later pumped into a customer's holding tanks did not fall under this exclusion and was a covered loss.

In this case, as the district court noted, it is undisputed that plaintiffs' claims in the underlying lawsuit are based on allegations that DG&G's negligence at the cotton gin caused the excess moisture in the cotton. Thus, the case is similar to Opies, not Kirchner. If damaged at the gin, it does not matter if the cotton developed significant additional damage after it left the gin. In cases of progressive damage, coverage issues are determined at the time the initial property damage occurs; progressive damage may affect the amount of the covered loss. See Stark Liquidation Co. v. Florists' Mut. Ins. Co., 243 S.W.3d 385, 393-94 (Mo. App. 2007); Scottsdale Ins. Co. v. Ratliff, 927 S.W.2d 531, 534 (Mo. App. 1996). The CGL policy expressly adopted this principle by providing that all loss "shall be deemed to occur at the time of the physical injury that caused it." Thus, if those with an ownership or financial interest in the cotton suffered *any* physical injury to their property when it was in DG&G's care, custody, and control at the gin, the entire loss is excluded, even if it was aggravated when the bales sat in warehouses while mold and mildew developed.[2] That brings us back to DG&G's alleged error of fact -- that the property damage did not occur until mildew, rot, and hard spots emerged at third party warehouses.

If the excessively moist cotton had left the DG&G gin completely undamaged, we would confront a highly unusual case, probably one that would turn on the CGL policy's "completed operations" coverage provisions, which we find difficult to decipher and significantly different than the comparable provisions a divided panel found perplexing in Reliance National Ins. Co. v. Hatfield, 228 F.3d 909 (8th Cir. 2000). But we need not enter that thicket, largely unexplored by the parties, because

---

[2]It is important that this appeal only concerns property damage to the ginned cotton. If excessively moist cotton made its way to a mill and was incorporated into yarn or fabric that became contaminated, the damage to that other property would likely be covered. Cf. Opies, 755 S.W.2d at 303; Esicorp, 266 F.3d at 862-63.

we agree with the district court that there is no genuine issue as to the material fact that at least some property damage occurred at the gin when DG&G added so much excess moisture that the cotton was "not merchantable" when it left the gin, and therefore Michigan Millers is entitled to judgment as a matter of law. DG&G's negligence caused the only "occurrence" that could be covered under the CGL policy. Thus, as in Kirchner, the property-damage-causing occurrence and at least some of the property damage occurred at the same time. The damaged property was then in the care, custody, and control of DG&G, the insured, so the exclusion applies.[3]

For these reasons, we agree with the district court that coverage under the CGL policy is excluded by the care, custody, or control exclusion. As coverage under the Umbrella Policy was no broader than under the underlying CGL Policy, we affirm the district court's grant of summary judgment on the two liability policies.

### III. The Agribusiness Policy

The Agribusiness Policy covered "direct physical loss" to specified types of property, including "personal property" and "stock," unless the loss was "caused by a peril that is excluded." Personal property and stock "of others," such as cotton owned by producers and delivered to DG&G for ginning, were covered only while in DG&G's "care, custody, or control."[4] The Agribusiness Policy provided property insurance, not liability insurance, so the Umbrella liability policy did not provide additional coverage for covered losses. The district court concluded that the Agribusiness Policy did not cover the loss because two policy exclusions applied: the

---

[3]Of course, if a third party's act caused all the property damage after the bales left the gin, Michigan Millers would have no duty to indemnify because DG&G would not be "legally obligated to pay" for that damage.

[4]The district court treated the cotton as "personal property," rather than "stock," a distinction that does not affect the coverage here at issue.

-8-

"Contamination or Deterioration" exclusion[5] and the "Defects, Errors, and Omissions" exclusion. On appeal, the parties brief a number of coverage issues. We conclude that the "Defects, Errors, and Omissions" exclusion applies and precludes coverage of this loss. Therefore, we do not consider the other issues.

The "Defects, Errors, and Omissions" provision excluded loss "caused by deficiencies or defects in design, development, specifications, materials, manufacturing, mixing, processing, testing, workmanship, or caused by latent or inherent defects." In the underlying lawsuit, DG&G asserted that the cotton suffered "direct physical loss" (mold, mildew, and hardening) caused by malfunctioning of the Lewis Moisture System that caused excess moisture to be applied during ginning, by failure of the Vomax device to detect excess moisture levels, and/or by packaging of the cotton at the gin in bags not suitable for moisture-enhanced cotton. These loss theories are premised upon defects in DG&G's processing, testing, workmanship, or materials used in the ginning operations that fall directly within the unambiguous terms of this exclusion. Plaintiffs in the underlying lawsuit asserted no other theory that would have caused "direct physical loss" to the cotton at DG&G's gin, as opposed to somewhere else such as at the Federal Compress warehouses.

DG&G does not argue to the contrary. Instead, it argues that applying this exclusion improperly nullifies a provision in the policy that defined "specified perils" to include "water damage," which was defined as "the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam." This contention is without merit.

[5]This provision excluded loss "caused by contamination or deterioration," including "fungus, mildew, mold, rot [or] change in grade or condition . . . ." Applying the exclusion to this case is complicated by a cross reference that limited the exclusion if loss was caused by a "specified peril," defined to include "water damage," and by a special policy endorsement for "Fungi, Wet Rot, Dry Rot, or Bacteria Limited Coverage." We need not resolve the parties' disagreement as to the proper interplay between these provisions.

The "specified perils" definition was cross-referenced elsewhere in the Agribusiness Policy -- for example, it limited the "Contamination or Deterioration" exclusion. But it was not cross-referenced in the "Defects, Errors, and Omissions" exclusion. The result was a rational coverage scheme, not a coverage nullification. Loss caused by the sudden bursting of a water pipe, including contamination loss, was covered. But if the insured's process included the intentional use of water, as in this case, "water damage" caused by a defect in processing, materials, or workmanship was excluded.

As none of the three policies covered the losses at issue, the district court properly granted summary judgment in favor of Michigan Millers. The judgment of the district court is affirmed.

_____