The GOODYEAR TIRE & RUBBER CO., Plaintiff,

v.

DYNAMIC AIR, INC., Defendant.

No. A04–2439.

Supreme Court of Minnesota.

Aug. 18, 2005.

Edward F. Fox, Kevin P. Hickey, Scott J. Hoss, Bassford Remele, P.A., Minneapolis, MN, for Appellant.

Timothy E. Branson, Angela M. Hall, Bryan C. Keane, Dorsey & Whitney, L.L.P., Minneapolis, MN, for Respondent.

Sharon L. Van Dyck, Schwebel, Goetz, & Sieben, P.A., Minneapolis, MN, for Amicus Curiae Minnesota Trial Lawyer Ass'n.

## OPINION

PAGE, Justice.

This case arises from a certified question from the United States District Court for the District of Minnesota, which asks us to determine the potential liability of a party insured by an insolvent insurer when the claim against the party exceeds the $300,000 statutory maximum available from the Minnesota Insurance Guaranty Association (MIGA). We conclude that the insured party may be liable for any portion of the claim that constitutes the difference between the $300,000 available

from MIGA and the liability limit of the insolvent insurer's policy.

In this case, The Goodyear Tire & Rubber Company seeks to recover nearly $2 million in consequential damages stemming from an incident involving an alleged malfunction in a pneumatic conveyance system purchased from Dynamic Air, Inc., a Minnesota corporation. Goodyear filed suit against Dynamic Air in Alabama state court, but the case was removed to federal court and transferred to the District of Minnesota. Following the federal court's ruling on Dynamic Air's motion for summary judgment, the claims remaining in this case are Goodyear's claims for breach of contract, breach of express warranty, breach of implied warranty of merchantability, and breach of implied covenant of fitness for a particular purpose.

At the time of the incident, Dynamic Air had $1 million in primary coverage liability insurance and $6 million in excess-umbrella coverage from Reliance Insurance Company. Shortly after Goodyear filed suit, Reliance became insolvent. Following Reliance's insolvency, MIGA took over Reliance's obligation to defend Dynamic Air against Goodyear's claims.

With MIGA's authorization and without admitting liability, Dynamic Air made an offer of judgment under Fed.R.Civ.P. 68 in the amount of $300,000, the statutory maximum available from MIGA. *See* Minn.Stat. § 60C.09, subd. 3 (2004). Dynamic Air then moved the federal court to dismiss Goodyear's claims as moot, asserting that

the offer of judgment was made in the full amount of Dynamic Air's potential liability under the MIGA Act.[1] With the parties' agreement, the federal court certified the following question to this court:

> Whether under Minn.Stat. § 60C.09, Subd. 3, the party insured by the insolvent insurer is not liable to the claimant for any portion of a claim that constitutes the difference between the $300,000 statutory maximum and the liability limit of the insolvent insurer's policy?

We reformulate the certified question to read as follows:

> Whether, under Minn.Stat. § 60C.09, subd. 3, a party insured by an insolvent insurer may be liable to a claimant for any portion of the claim that constitutes the difference between the $300,000 statutory maximum available from the Minnesota Insurance Guaranty Association and the liability limit of the insolvent insurer's policy.

*See* Minn.Stat. § 480.065, subd. 4 (2004) (stating that this court "may reformulate a question of law certified to it"). We answer the reformulated question in the affirmative.[2]

Certified questions are questions of law that we review de novo. *B.M.B. v. State Farm Fire & Cas. Co.*, 664 N.W.2d 817, 821 (Minn.2003). We also review the construction of statutes de novo. *Am. Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000).

---

1. The federal court initially determined that it could not resolve the questions presented by Dynamic Air's motion to dismiss, but Goodyear and Dynamic Air then stipulated that Dynamic Air's net worth as of December 31, 2000, inclusive of its affiliates and subsidiaries, was less than $25 million on a consolidated basis, as required for a claim to be covered under the MIGA Act. *See* Minn.Stat. § 60C.09, subd. 2(3) (2004). The parties also stipulated that any payment of the $300,000 pursuant to

the offer of judgment would not preclude Goodyear from pursuing additional recovery on its claims from Reliance's liquidator.

2. In answering the reformulated question, we do not address any issue related to the amount of a claim in excess of the liability limit of the policy issued by the insolvent insurer.

We begin our discussion with a brief history of the MIGA Act. In 1969, the National Association of Insurance Commissioners (NAIC) undertook the effort to prevent failures of insurance companies from undermining public confidence in the insurance industry. *See* Proceedings of the NAIC, 1970–1 NAIC Proc. 251, 262 (1970). The NAIC recommended that each state create an insurance insolvency fund that would pay covered claims under certain insurance policies, minimize financial loss to claimants or policyholders because of the insolvency of an insurer, and create an association to assess the cost of such protection among insurers. *See Post–Assessment Prop. & Liab. Ins. Guar. Assn Model Act* § 2, *reprinted in* 3 *NAIC Model Laws, Regulations & Guidelines* (1997).

As a result, in 1971, the Minnesota legislature enacted the MIGA Act and created MIGA, an association made up of all insurers authorized to transact business in Minnesota. Act of Apr. 22, 1971, ch. 145, §§ 1–23, 1971 Minn. Laws 277, 277–88; *see* Minn.Stat. § 60C.04 (2004). As enacted, the MIGA Act largely followed the model act developed by the NAIC. MIGA is funded by assessments levied on the member insurers in proportion to their "net direct written premiums," the cost of which is passed on to policyholders. Minn.Stat. §§ 60C.06, subd. 1 (2004); 60C.18, subd. 1 (2002). The stated purposes of the MIGA Act are

> to provide a mechanism for the payment of covered claims under certain insurance policies and surety bonds, to the extent provided in this chapter, minimize excessive delay in payment and to avoid financial loss to claimants or policyholders because of the liquidation of an insurer, and to provide an association to assess the cost of the protection among insurers.

Minn.Stat. § 60C.02, subd. 2 (2004). To effect these purposes, the Act is to be "liberally construed." *Id.*, subd. 3 (2004).

Under the Act, MIGA is "deemed the insurer to the extent of its obligation on the covered claims." Minn.Stat. § 60C.05, subd. 1 (2004). A "covered claim" includes any unpaid claim that: (a) "arises out of and is within the coverage of an insurance policy issued by a member insurer if the insurer becomes" insolvent; (b) "arises out of a class of business which is not excepted from" the scope of the Act by section 60C.02; and (c) is made by, among others, a policyholder who was a resident of Minnesota "at the time of the insured event" or "a third party claimant under a liability policy" if the insured or third-party claimant was a resident of Minnesota at the time of the insured event. Minn. Stat. § 60C.09, subd. 1.

■ Reflecting the practical limitations that a guaranty association has, MIGA's "[p]ayment of a covered claim, whether upon a single policy or multiple polices of insurance, is limited to no more than $300,000," regardless of the amount of coverage provided by the insolvent insurer. Minn.Stat. § 60C.09, subd. 3; *see Post– Assessment Prop. & Liab. Ins. Guar. Assn Model Act, supra,* § 8(A)(1) cmt. "In no event is the association obligated to the policyholder or claimant in an amount in excess of the obligation of the insurer under the policy from which the claim arises." Minn.Stat. § 60C.09, subd. 3. Therefore, MIGA's payment obligation on a covered claim is limited to the lesser of the amount of coverage under the insolvent insurer's policies or the statutory maximum of $300,000. Because the two Reliance policies involved here provide for a total of $7 million in coverage, MIGA's payment obligation is limited to $300,000.

We have not interpreted the statutory language limiting covered claims and have

not had occasion to consider the question raised here—whether the party insured by an insolvent insurer may be liable to a claimant for any portion of the claim that constitutes the difference between the $300,000 statutory maximum available from MIGA and the liability limit of the insolvent insurer's policy. The Minnesota Court of Appeals has addressed this question on two occasions in published decisions. First, in *Minnesota Mining & Manufacturing Co. v. H & W Motor Express Co.*, the court of appeals described its understanding of the insured's potential liability, stating: "If a claimant recovers the statutory maximum from [MIGA], the claimant cannot pursue the insured for the balance, except to the extent the policy issued by the insolvent insurer would not have covered the claim." 507 N.W.2d 622, 624 (Minn.App.1993), *rev. denied* (Minn. Dec. 22, 1993). In the more recent case of *Van Guilder v. National Freight, Inc.*, the court of appeals stated that "[t]he party insured by the insolvent insurer is not liable for any portion of a claim that constitutes the difference between the $300,000 MIGA liability cap and the liability limit of the insolvent insurer's policy." 686 N.W.2d 339, 347 (Minn.App.2004), *rev. denied* (Minn. Dec. 14, 2004).

Relying heavily on the court of appeals' statements in these cases, Dynamic Air asserts that the Act "fully protects the insured against covered claims to the extent of the limits of coverage afforded by the insured's policy with its insolvent insurer." Because Dynamic Air's policies with Reliance would have covered Goodyear's claims completely had Reliance not become insolvent, Dynamic Air contends that when MIGA stepped into the shoes of Reliance and offered to pay the statutory maximum of $300,000, MIGA satisfied the entire obligation of Reliance. Therefore, Dynamic Air maintains that Goodyear cannot pursue it for the difference between

the $2 million in damages claimed and the $300,000 MIGA payment. According to Dynamic Air, this result reflects a reasonable balance of interests and safeguards the policyholder's reasonable expectation of coverage.

Goodyear, on the other hand, asserts that "Dynamic Air ignores the fact that the purpose of the statute is to protect *both* claimants and insureds" and Dynamic Air's interpretation of the MIGA Act favors "the interests of liable defendants over the rights of their victims." Goodyear argues that the focus of the Act always has been how much MIGA will pay— not how little the wrongdoer must pay in excess of the Act's statutory maximum— and the Act was not intended to shield defendants from direct liability to their victims. According to Goodyear, if the legislature had intended to limit the rights of injured persons or provide defendants with immunity, it would have done so explicitly, as it did in providing immunity to government entities with insolvent insurers. *See* Minn.Stat. § 3.736, subd. 8 (2004).

■ In answering the question of the insured's potential liability for the difference between the $300,000 statutory maximum available from MIGA and the liability limit of the insolvent insurer's policy, we look first to the statutory language. "Our primary objective in interpreting statutory language is to give effect to the legislature's intent as expressed in the language of the statute." *Pususta v. State Farm Ins. Cos.*, 632 N.W.2d 549, 552 (Minn. 2001); *see* Minn.Stat. § 645.16 (2004).

Although the specific words of the MIGA Act do not answer the question of the insured's obligation on claims that exceed the $300,000 payment cap, Dynamic Air's position that it "is fully protected by the statutory liability cap" is based on its view of MIGA's deemed obligation under

the Act. According to Dynamic Air, the statute plainly states that MIGA is "deemed the insurer" and "assumes" the insolvent insurer's obligations, citing Minn. Stat. § 60C.05, subd. 1(a), which provides that MIGA shall "[b]e *deemed the insurer* to the extent of *its* obligation on the covered claims." (Emphasis added.) Dynamic Air reads this language to mean that MIGA is deemed the insurer to the extent of the *insolvent insurer's* obligation on the covered claims. Because the insolvent insurer's obligation on the covered claim is equal to the limits of coverage under the insurance policy, Dynamic Air argues that "[t]he only reasonable construction of this language is that the statutory protection is measured by the limits of the policy with the insolvent insurer." Accordingly, Dynamic Air concludes that once MIGA makes its payment, the Act's limitation on "payment of a covered claim" necessarily ends the insured's liability to the claimant to the extent of the limits of the policy.

█ Goodyear, however, interprets section 60C.05, subdivision 1(a), to mean that MIGA is deemed the insurer only to the extent of *MIGA's* obligation on the covered claims. We agree. Applying rules of grammar and giving the words of this section their common and approved meanings, we conclude that the word "its" in section 60C.05, subdivision 1(a), does not refer to the insolvent insurer, but rather to MIGA. *See* Minn.Stat. § 645.08(1), (3) (2004) (stating that we are to construe the words and phrases of a statute according to rules of grammar and common approved usage, and we restrict the meaning of general words by preceding particular words). Thus, the association is deemed the insurer only to the extent of MIGA's limited payment obligation of $300,000.

Our conclusion regarding the limited role of MIGA is consistent with other provisions of the Act, which describe the asso-

ciation's "substantial limitations and exclusions." *See* Minn.Stat. § 60C.21, subd. 2 (2004). For example, if the insured's deductible or self-insured retention under the insolvent insurer's policy exceeds MIGA's maximum payment obligation of $300,000, the association has no obligation on the claim. *See* Minn.Stat. § 60C.09, subd. 2(4) (stating that a "covered claim" does not include "any claims under a policy written by an insolvent insurer with a deductible or self-insured retention of $300,000 or more, nor that portion of a claim that is within an insured's deductible or self-insured retention"). Similarly, if an insured's consolidated net worth exceeds $25 million, the association has no obligation on the claim. *See* Minn.Stat. § 60.09, subd. 2(3) (stating that a "covered claim" does not include any claims "by an insured whose net worth exceeds $25,000,000").

█ Even on covered claims, MIGA does not take the place of the insolvent insurer on all of the contractual obligations that the insolvent insurer had. As a creature of statute, MIGA has only those obligations imposed upon it by the MIGA Act. Once MIGA has paid a covered claim, its obligation on that claim is satisfied and its role as the deemed insurer is fulfilled. Accordingly, the Act does not provide the same level of protection to insureds that the policy issued by the insolvent insurer would afford had the insurer remained solvent. These limits are made clear by the notice that insurers are required to provide with every application for property and casualty insurance in this state. *See* Minn.Stat. § 60C.21, subd. 1 (2004). The required notice specifically advises policyholders not to rely on the protection provided by the association and states in part:

The financial strength of your insurer is one of the most important things for you to consider when determining from whom to purchase a property or liability

insurance policy. It is your best assurance that you will receive the protection for which you purchased the policy. If your insurer becomes insolvent, you may have protection from the Minnesota Insurance Guaranty Association * * * but to the extent that your policy is not protected by the Minnesota Insurance Guaranty Association or if it exceeds the guaranty association's limits, you will only have the assets, if any, of the insolvent insurer to satisfy your claim.

Minn.Stat. § 60C.21, subd. 2 (2004).

 Having concluded that MIGA is deemed the insurer only to the extent of the association's obligation on the covered claims, we next consider whether the $300,000 payment limitation provides any protection to the insured of an insolvent insurer with respect to the insured's liability to a claimant. The language of the MIGA Act does not address this question. Therefore, we must go back to the law in existence before the enactment of the MIGA Act to ascertain the intent of the legislature. See Minn.Stat. § 645.16(5) (2004) (considering former law, including other law upon the same or similar subjects, as a factor for ascertaining legislative intent). In enacting statutes, we presume that the legislature acts with full knowledge of existing law. *Minneapolis E. Ry. Co. v. City of Minneapolis*, 247 Minn. 413, 418, 77 N.W.2d 425, 428 (1956). We generally presume that a statute is consistent with the common law and, if the legislature intends to enact a statute that abrogates the common law, the legislature will do so by express wording or necessary implication. *In re Shetsky*, 239 Minn. 463, 469, 60 N.W.2d 40, 45 (1953).

 At common law, without the protection of an insurance policy, the party who is at fault for breaching a contract or violating a statutory duty bears the risk of loss from the claims arising from its ac-tion. An insurance policy essentially shifts the risk of loss from the insured to the insurer whereby the insurer assumes the risk of loss and undertakes to indemnify the insured against such loss. See 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 1:9 (1995); *see also Knutson Constr. Co. v. St. Paul Fire & Marine Ins. Co.*, 396 N.W.2d 229, 233–34 (Minn. 1986) (discussing risk exposure and risk shifting in construction projects). Under our case law, insurance policies are contracts and, unless there are statutory laws to the contrary, general principles of contract law apply. *Epland v. Meade Ins. Agency Assocs., Inc.*, 564 N.W.2d 203, 207 (Minn.1997). Under contract law, for a consideration that usually is paid in money, the insurer promises to make a certain payment, usually of money, upon the destruction or injury of something in which the insured has an interest. 1 Russ & Segalla, *supra*, § 1:6. Regardless of the nature of the dispute between an insured and a claimant, the insurer is obligated to indemnify the insured according to the terms of the insurance contract. As such, the relationship between the insurer and the insured is generally that of debtor and creditor. 3 *id.* § 40:7. The insolvency and dissolution of an insurer "ipso facto terminates outstanding policies," and the insurer is liable to the insured in damages for breaching the insurance contract. 1 *id.* § 6:1.

 Because the loss sustained by the insured arises from the insured's dealings with a third party, there are no principles in insurance law that would prevent the third party from pursuing its claims against the insured, regardless of whether or not the insurer is capable of indemnifying the insured. In other words, upon insolvency, the insurer is no longer in a position to assume the risk and indemnify its insured, and the risk of loss is shifted

back to the insured, completely exposing the insured to the claims asserted by the third party even though such claims would have been covered by the policy issued by the insolvent insurer. The only remedy available to the insured is to assert a claim against the assets of the insolvent insurer.

█ Here, neither the Act nor its legislative history indicates, either expressly or by necessary implication, that the enactment of the MIGA Act abrogates any common law rule with respect to the insured's liability. Therefore, we conclude that MIGA's duty to pay covered claims does not affect the insured's liability for claims that exceed the $300,000 maximum payment available from MIGA.[3] Our conclusion about legislative intent is reinforced by the legislature's recent amendment of Minn.Stat. § 60C.09, subd. 2, adding a provision stating that a covered claim does not include "any claims under a policy written by an insolvent insurer with a deductible or self-insured retention of $300,000 or more." Act of May 22, 2003, ch. 74, § 6, 2003 Minn. Laws 393, 399. We do not believe that the legislature intended for an insured with a deductible or self-insured retention of $300,000 or more to be completely responsible for a claim, regardless of the amount, while an insured with a deductible or self-insured retention of less than $300,000 essentially has no liability, at least as long as the claim is within the coverage limits of the policy. We recognize that the protection from MIGA may

fall short of what the original policy would have provided. However, there is nothing in the Act that prevents an insured from making a claim against the assets, if any, of the insolvent insurer.

█ Although we realize that the Minnesota Court of Appeals has reached a different conclusion on the issue of the insured's liability for a claim that exceeds MIGA's payment obligation, we are not bound by the court of appeals' interpretation of the MIGA Act in previous cases. Further, our decisions to deny further review in the *Minnesota Mining* and the *Van Guilder* cases do not constitute an endorsement of the reasoning of the court of appeals or the result reached in those cases. *See State v. Shamp*, 427 N.W.2d 228, 230 n. 3 (Minn.1988). Our decision to deny or accept a petition for further review is not guided by whether we agree or disagree with the court of appeals' decision, but rather by the criteria for review set forth in Minn. R. Civ.App. P. 117, subd. 2. Consequently, we have warned against the temptation to read significance into a denial of further review. *Murphy v. Milbank Mut. Ins. Co.*, 388 N.W.2d 732, 739 (Minn.1986). Moreover, notwithstanding the court of appeals' statements in *Minnesota Mining* and *Van Guilder*, it is not clear that the issue of the insured's obligation under the MIGA Act for an amount in excess of MIGA's $300,000 payment obligation was raised on appeal in those

---

**3.** We note that other jurisdictions confronting this issue have reached the same conclusion on different bases. *See Johnson v. Braddy*, 376 N.J.Super. 215, 869 A.2d 964, 967 (2005) (reasoning that "if the Legislature had intended to immunize tortfeasors from liability for damages in excess of the Guaranty Association's $300,000 maximum liability, it would have included a provision in the Guaranty Act expressly stating that intent"), *appeal granted* (N.J. June 9, 2005). *Vickers v. Howe*, 123 Ohio App.3d 456, 704 N.E.2d 344, 349 (1998)

(holding that, because a victim retains the rights to sue the tortfeasor for any amount exceeding the payment by an insurer under common law, the defendant is liable for any judgment above the $300,000 statutory cap); *Osborne v. Neville*, 65 Pa. D & C.4th 225, 242 (Pa.Ct.Comm.Pl.2004) (stating that nothing contained in the state's insurance guaranty acts "bestows immunity upon a health care provider for any portion of a malpractice judgment that is not paid" by the state's guaranty association).

cases, and the issue was not raised in the petitions for further review in those cases.

Although Goodyear's claims amount to nearly $2 million, the coverage provided by MIGA as the deemed insurer is not the $7 million amount that would have been available from Reliance, but rather the $300,000 amount provided by the MIGA Act. MIGA's limited payment obligation does not affect the insured's potential liability on the claims. To the extent that Dynamic Air's liability on Goodyear's claims exceeds MIGA's offer of judgment in the amount of $300,000, Goodyear retains the right to pursue its claims against Dynamic Air. Therefore, we answer the certified question as reformulated in the affirmative, holding that a party insured by an insolvent insurer may be liable for any portion of a claim that constitutes the difference between the $300,000 statutory maximum available from MIGA and the liability limit of the insolvent insurer's policy.

As reformulated, certified question answered in the affirmative.