# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3310

_____

Stan Koch & Sons Trucking, Inc.,       *

                               *

         Appellant,                *

                               *   Appeal from the United States

     v.                           *   District Court for the

                               *   District of Minnesota.

Great West Casualty Company,      *

                               *

         Appellee.               *

_____

Submitted: September 27, 2007
Filed: February 28, 2008

_____

Before BENTON, BOWMAN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This appeal arises from a dispute over insurance coverage between an insured, Stan Koch & Sons Trucking, Inc. ("Koch"), and its insurer, Great West Risk Management, Inc. ("Great West"). Koch filed this action seeking a declaratory judgment that Great West: (1) accepted coverage for a fatal motor vehicle accident not covered by Koch's Trucker's Liability Insurance Policy (the "Policy") and (2) breached the fiduciary duty that it owed Koch by settling a personal injury claim arising out of the accident, and that Koch is not obligated to pay Great West the $500,000 that Great West requested pursuant to the Policy's Retention Endorsement (the "Retention"). Great West counterclaimed seeking a declaratory judgment that Great West was obligated to provide coverage for the accident. Both parties moved

for summary judgment. Interpreting the Policy's provisions and applying Minnesota law, the district court[1] held that the Policy provided coverage for the accident and that there was no evidence that Great West breached a fiduciary duty to Koch in accepting coverage and in settling the personal injury claim. The court granted summary judgment to Great West and declared that Koch is obligated to pay the $500,000 Retention. For the reasons discussed below, we affirm.

I.

Great West and Koch entered into the Policy in July 2001, providing up to $3 million in liability coverage. However, under the Policy's Retention, Koch "agree[d] to reimburse [Great West] for the first $500,000 of any loss or claim for each accident" covered by the Policy.[2] The Policy provided in pertinent part:

A. COVERAGE
We will pay all sums an "insured" legally must pay as damages because of "bodily injury" . . . to which this insurance applies,

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

[2]"An insurance policy essentially shifts the risk of loss from the insured to the insurer whereby the insurer assumes the risk of loss and undertakes to indemnify the insured against such loss." Goodyear Tire & Rubber Co. v. Dynamic Air, Inc., 702 N.W.2d 237, 244 (Minn. 2005). However, "[a] retention endorsement has the effect of reversing the normal insurer-insured relationship." Ill. Employers Ins. of Wausau v. Rapco Foam, Inc., No. 83 C 3440, 1987 WL 11847, *6 (N.D. Ill. May 29, 1987). According to the terms of the Retention at issue here, Koch agreed to reimburse Great West for the first $500,000 of any claim under the Policy rather than paying Great West to pay and absorb forever the total amount of a claim, the usual risk-shifting associated with an insurance policy as articulated by the Minnesota Supreme Court in Goodyear. See 702 N.W.2d at 244.

caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

. . .

1.	WHO IS AN INSURED
The following are "insureds":
a.	You for any covered "auto".
b.	Anyone else while using with your permission a covered "auto" you own, hire or borrow . . . .

The Policy's "Definitions" section states that "[a]uto" means, among other things, a "trailer." Finally, the Policy's "trucker" exclusion,[3] also relevant to this appeal, provides that:

[N]one of the following is an "insured":
a.	Any "trucker", or his or her agents or "employees", other than you and your "employees":
	(1)	If the "trucker" is subject to motor carrier insurance requirements and meets them by a means other than "auto" liability insurance.
	(2)	If the "trucker" is not insured for hired "autos" under an "auto" liability insurance form that insures on a primary basis the owners of the "autos" and their agents and "employees" while the "autos" are being used exclusively in the "truckers" business and pursuant to operating rights granted to the "trucker" by a public authority.

On March 22, 2002, Kelly Ann Kelly was killed in a car accident involving a tractor-trailer rig driven by David White. White, the owner of the 1998 Freightline tractor, was pulling a 1994 Trailmobile trailer for Supreme Transport Services, LLC (together "Supreme/White"). Supreme leased the trailer from United Trailer Leasing,

---

[3]The Policy defines "trucker" as "any person or organization engaged in the business of transporting property by 'auto' for hire."

a division of Hargol Corporation, which in turn is a wholly-owned subsidiary of Koch. Kelly Ann Kelly's husband, Kevin Kelly ("Kelly"), brought a wrongful death action in Minnesota state court against the driver of the car she was riding in, the driver of a car that was driving next to the car she was in, and Supreme/White. Koch was not a party to the Kelly litigation. Supreme/White tendered their defense in the Kelly litigation to Sirius American Insurance Company ("Sirius"), which insured Supreme/White for $1,000,000 in liability coverage.

During the discovery phase of the Kelly litigation, Kelly obtained a copy of Koch's Policy with Great West. On June 4, 2003, with a trial scheduled for September 2003, Kelly put Koch and Great West on notice of the Kelly litigation and asserted that Great West's coverage was exposed because Supreme/White qualified as insureds under the Policy. On July 15, 2003, Great West notified Kelly of its position that the Policy did not extend to Supreme/White. On July 21, 2003, Kelly's counsel wrote a letter to Great West, which it forwarded to Koch the following day, stating that Kelly believed Koch's Policy was implicated in the Kelly litigation because: (1) the trailer involved was a "covered auto" pursuant to the Policy's definition of the term and (2) Supreme was an insured under the Policy as coverage was afforded not only to the named insured, but also to permissive users of "covered autos" including those subject to a contract or rental. The letter recognized Sirius as the primary insurer for Supreme/White with the Great West policy providing excess coverage. The letter also provided that, due to Great West's position that coverage did not exist, Kelly would attempt to mediate the claim against Supreme and then pursue Great West directly for coverage. On July 22, 2003, Supreme/White tendered the Kelly litigation to Great West "to the extent coverage is provided under [the Policy]."

In response to these developments, Great West retained an attorney, Ted Smetak, to advise it of its obligations to Supreme/White. Smetak performed a lengthy coverage analysis, and, on August 19, 2003, recommended that Great West deny coverage for the Kelly accident. However, Smetak qualified his recommendation,

acknowledging that there were arguments both for and against coverage such that the position that the Policy did not cover Supreme/White, although valid, "might lose." Smetak also pointed out two settlement devices under Minnesota law that Kelly could utilized to pursue Great West's coverage (assuming the Policy covered the Kelly accident), a Miller-Shugart settlement agreement[4] and a Drake v. Ryan settlement agreement.[5]

On August 27, 2003, Smetak authored a follow up opinion, discussing an intimation by Kelly's counsel in his correspondence to Great West, that a hybrid settlement agreement might be reached among the parties to the Kelly litigation which combined the features of a Miller-Shugart settlement agreement with a Drake v. Ryan agreement, which "*if valid*, might possibly allow the claimants to simultaneously settle

---

[4]A Miller-Shugart settlement agreement, a product of the seminal case, Miller v. Shugart, 316 N.W.2d 729 (Minn. 1982), arises where an insurer denies all coverage for an accident, and the abandoned insured agrees with the accident victim that judgment in a certain sum may be entered against it in return for the accident victim releasing the insured from any personal liability and agreeing to seek coverage from the insurer. Id. at 731-32. The Minnesota Supreme Court found that a Miller-Shugart agreement is enforceable against the insurer so long as it receives notice of the settlement, and the settlement is (1) reasonable and (2) not a product of fraud or collusion. Id. at 733-35. In this instance, if Great West erroneously denied coverage for the Kelly litigation, then Supreme/White could stipulate to a money judgment in favor of Kelly in exchange for Kelly releasing Supreme/White from personal liability and agreeing to seek the disputed liability coverage from Great West.

[5]A Drake v. Ryan settlement agreement arises out of the Minnesota Supreme Court's decision in Drake v. Ryan, 514 N.W.2d 785 (Minn. 1994), holding that a plaintiff may "fully release[] [a] defendant and his primary liability insurer up to the limits of the primary liability coverage but expressly retain[] the right to pursue [his or her] claims against the defendant for additional damages up to the limits of the defendant's excess liability coverage." Id. at 790. Here, assuming the Great West policy covers the Kelly accident, Kelly could fully release Supreme/White to the extent of the Sirius policy limits, while preserving the right to pursue claims against Great West for up to $3 million.

(for some dollar sum) the Sirius layer and stipulate to another $3,000,000 in damages." Smetak suggested that if this was Kelly's intention, Great West should proceed with "more caution in denying coverage" because: (1) "denying coverage is a necessary pre-requisite to a *Miller Shugart* stipulated judgment;" (2) Great West "might not have another opportunity to step in and admit coverage;" (3) "the dollar exposure after a *Miller Shugart* [settlement] [could] be a lot more than that which a jury would assign after a trial;" and (4) "the risk that coverage can be found to exist under the Great West policy" was "not an insignificant risk." Thus, the bottom line, as stated by Smetak, was that "the argument for coverage exists" and that "[t]he defense theories against that argument [are] far from rock solid." Accordingly, as of late August 2003, Great West had serious concerns that the Policy extended to Supreme/White for purposes of the Kelly accident.

The trial in the Kelly litigation was to begin on September 29, 2003. On September 11, 2003, Great West informed William Sullivan, Koch's Risk Manager, via fax, that Great West had not yet made a decision on whether the Policy provided excess coverage for the Kelly accident, that Great West would keep Koch posted about developments in the case, and that Sullivan could call Great West with any questions. The fax also contained copies of two letters, both of that same date, from Kelly's counsel and Smetak. The Kelly letter provided that: (1) Kelly, as well as two other plaintiffs in the Kelly litigation, had made a joint demand in all three cases for the Sirius policy limits of $1,000,000; (2) that there was a substantial likelihood of the jury finding Supreme/White more than 15% at fault, rendering Supreme/White jointly and severally liable for all of the damages which would be far in excess of the Sirius coverage;[6] and (3) as a result, Koch would be liable for the excess judgment. The

---

[6]Prior to a May 19, 2003 amendment, Minnesota Statute section 604.02, subdivision 1 provided that a person who was more than 15 percent causally liable was jointly and severally liable for the whole award, 2003 Minn. Sess. Law Serv. ch. 71, § 1 (West) (amending Minn. Stat. § 604.02, subd. 1); the statute was amended to require that a person be more than 50 percent at fault in order for joint and several

Smetak letter addressed the information provided in the Kelly letter, noting that the joint demand by the Kelly plaintiffs had removed some of the obstacles to settlement with Sirius.

On September 24, 2003, with the Kelly litigation approaching trial, Kelly's counsel notified Smetak of Kelly's intention to pursue a Miller-Shugart agreement with Supreme/White. On September 26, 2003, Great West provided Sullivan with Smetak's coverage opinion of that same date. There, Smetak acknowledged both that "Great West does not wish to accept coverage" and that "coverage for this kind of claim is illogical." Smetak goes on to state that if Great West was "very confident that there was 'no coverage' then [it] should not 'admit' coverage." Then the issue would be whether the Policy provided coverage for Supreme/White and, if a court found that it did not, any settlement agreement involving a stipulated judgment against Koch would be of no consequence. However, Smetak again cautioned Great West that if it believed there was a risk that a court would construe the Policy to apply to Supreme/White, then it is "a $3,000,000 risk. Because that is what Kelly's attorneys will try to put into the Miller Shugart. That is the balancing act. While I would like to be able to guarantee you a declaration of 'no coverage[,]' the risk is greater than that."

Immediately before the trial began, Sirius entered into a Drake v. Ryan release with Kelly, preserving Kelly's right to proceed against Great West and further increasing the likelihood that Supreme/White would enter into a Miller-Shugart settlement with respect to the Policy. Based on Smetak's observations, the developments between Kelly and Supreme/White, Great West's concern that it would be unsuccessful in disproving coverage, and Great West's belief that it was very likely that there would be a defense verdict at trial exonerating Supreme/White and mooting

---

liability to attach. Minn. Stat. § 604.02, subd. 1 (1).

the coverage issue,[7] Great West accepted coverage for Supreme/White on September 30, 2003. At that time, Koch had not issued a written objection to coverage. However, Sullivan testified that he verbally objected to coverage when he learned that Great West was planning on accepting coverage, which according to Sullivan, was one to two weeks before the Kelly litigation went to trial.

The Kelly litigation proceeded to trial, and the jury returned a $2.7 million verdict, assigning 60% of the fault to Supreme/White. See Kelly v. Ellefson, 712 N.W.2d 759, 765 (Minn. 2006). Supreme/White appealed the judgment, and the Minnesota Court of Appeals, citing a number of trial errors, reversed and remanded for re-trial on the liability issues. Kelly v. Ellefson, 2005 WL 525548 (Minn. Ct. App. Mar. 8, 2005) (unpublished). Though Kelly petitioned for review of all issues, the Minnesota Supreme Court granted review and reversed only as to the court of appeals's finding that the trial court abused its discretion by denying admission of Kelly's pleadings, interrogatory answers, and expert's affidavit. Kelly, 712 N.W.2d at 766, 768-71. The court then remanded the case. Id. at 771.[8]

In May 2005, while the Kelly verdict was on appeal, the claims of Corbin Ellefson, who was also injured in the accident, were being addressed in a mediation session. Great West agreed to pay Ellefson $750,000 to settle his claims. In accordance with the Retention, Great West paid the full settlement to Ellefson and

---

[7]Based on the representations of counsel for Supreme/White to Great West that Supreme/White "had excellent liability defenses" on the merits of the Kelly litigation such that it was likely that the jury would return a defense verdict, Great West believed that, in admitting excess coverage, the exposure was minimal because Supreme/White's potential liability was within the $1,000,000 in liability coverage provided by the Sirius policy. Koch's Risk Manager, William Sullivan, testified that, as of mid-September 2003, he also believed that the Kelly litigation would result in a defense verdict.

[8]The record is unclear as to the current status of the Kelly litigation.

then requested reimbursement of $500,000 from Koch. Koch declined to pay the Retention, asserting that it had "never acquiesced that coverage is applicable in this case."

In June 2005, Koch filed this declaratory judgment action, seeking a declaration that Supreme/White were not insureds under the Policy and that Great West had breached the fiduciary duty it owed Koch by accepting coverage for the Kelly accident and settling with Ellefson.[9] Great West counterclaimed, seeking a judgment that Supreme and White were insureds under the Policy and that Great West had acted properly in accepting coverage for the Kelly accident and settling the Ellefson claim. The parties filed cross-motions for summary judgment. The district court granted Great West's motion and denied Koch's motion, finding that Supreme/White were insureds under the Policy and, even if Koch had raised a breach of fiduciary duty claim in its complaint, there was no evidence that Great West had breached such a duty by accepting coverage in the Kelly litigation or settling with Ellefson. Thus, the district court found that Koch was obligated to pay Great West the $500,000 Retention. Koch brings this appeal.

## II.

Koch contends that the district court erred in determining that Supreme/White were insureds under the Policy for purposes of the Kelly accident because: (1) the Policy's "trucker" exclusion precludes coverage and (2) under the Minnesota No-Fault Automobile Insurance Act (the "No-Fault Act"), Minn. Stat. §§ 65B.41-65B.71, Koch did not "own" the trailer at the time of the accident. Koch further contends that the court erred in granting summary judgment to Great West on the breach of fiduciary

---

[9]The district court acknowledged that "Great West argue[d] that Koch did not allege a breach of fiduciary duty or bad faith claim in its Complaint, and the Court is inclined to agree. However, for the sake of completeness, the Court will consider Koch's arguments . . . ." Stan Koch & Sons Trucking, Inc. v. Great W. Cas. Co., No. 05-1225, 2006 WL 2331181, *6 (D. Minn. Aug. 10, 2006) (unpublished).

duty claim because (1) Great West breached its fiduciary duty by accepting coverage without Koch's consent and contrary to its express wishes and (2) genuine issues of material fact preclude summary judgment for Great West. "We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. We also review the district court's interpretation of an insurance policy provision de novo." Source Food Tech., Inc. v. U.S. Fid. & Guar. Co., 465 F.3d 834, 836 (8th Cir. 2006). We address each of Koch's contentions in turn.

## A.

Interpretation of an insurance policy is a matter of state law, Allstate Ins. Co. v. Blount, 491 F.3d 903, 908 (8th Cir. 2007), and it is undisputed that the issues in this case are governed by Minnesota law. Under Minnesota law, "[w]hen insurance policy language is clear and unambiguous, 'the language used must be given its usual and accepted meaning.'" Wanzek Constr., Inc. v. Employers Ins. of Wausau, 679 N.W.2d 322, 324 (Minn. 2004) (quoting Lobeck v. State Farm Mut. Auto. Ins. Co., 582 N.W.2d 246, 249 (Minn. 1998)). Because the Policy's terms are unambiguous, our review of this appeal turns on the plain language of the Policy.

"[T]he insured bears the initial burden of demonstrating coverage, [and] the insurer carries the burden of establishing the applicability of exclusions." Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006). However, "[e]xclusions are to be strictly interpreted against the insurer and an insurer denying coverage because of an exclusion bears the burden of proof." Agri. Ins. Co. v. Focus Homes, Inc., 212 F.3d 407, 410 (8th Cir. 2000) (quoting Bob Useldinger & Sons, Inc. v. Hangsleben, 505 N.W.2d 323, 327 (Minn. 1993)); see Am. Family Ins. Co. v. Walser, 628 N.W.2d 605, 609, 613 (Minn. 2001) (providing that insurance contract exclusions are construed narrowly and strictly against the insurer); see also Wanzek Const., Inc., 679 N.W.2d at 325 (ambiguity is construed in favor of

coverage). Thus, due to the role reversal in this case, where it is the insured, Koch, who is contending that the Policy does not provide coverage, there is a corresponding reversal of the burden of proof. Accordingly, it is Great West that bears the burden of establishing that Supreme/White are insureds under the Policy, and Koch that must prove the applicability of the exclusion. See Travelers Indem. Co., 718 N.W.2d at 894; see also Agri. Ins. Co., 212 F.3d at 410; Am. Family Ins., 628 N.W.2d at 609, 613.

Great West contends that Supreme and White are insureds under the Policy because it provides coverage for anyone permissibly operating a "covered" vehicle, and there is no dispute as to either element: (1) Supreme leased the Koch trailer and (2) the Policy defines a trailer as a "covered" auto. However, Koch argues that both sections of the Policy's "trucker" exclusion except Supreme/White from coverage because: (1) Supreme and White are truckers, not Koch employees, and they are not affiliated with Koch in any way; (2) the lease agreement for the trailer states that Supreme/White are covered by their own "motor carrier insurance requirements"; (3) Supreme/White were covered by their own insurance policy not Koch's; and (4) other courts have concluded that the "trucker" exclusion at issue here excludes coverage for truckers like Supreme and White.

We find that Supreme/White are insureds under the Policy for purposes of the Kelly accident because the definition of an insured plainly extends to permissive users of the Koch trailer which is undisputedly the case here. Moreover, Koch has failed to demonstrate the applicability of either section of the "trucker" exclusion. Supreme/White falls within the Policy's definition of "trucker." However, section (a)(1) is inapplicable because it excludes truckers who are subject to motor carrier insurance requirements and satisfy them in a way other than auto liability insurance, and the record shows that Supreme/White, though subject to such requirements, met them only through the Sirius policy, as Koch concedes. Koch has offered no argument as to how this is not dispositive of its claim as to section (a)(1).

-11-

With regard to section (a)(2), it excludes coverage for truckers that operate "hired 'autos,'" here the Koch trailer involved in the Kelly accident, without obtaining primary insurance for the "auto." Koch contends that section (a)(2) applies here, despite the fact that the Sirius policy provides primary coverage for the tractor involved in the Kelly accident, because the record does not demonstrate that Supreme/White obtained primary auto liability insurance for the Koch trailer. This contention fails for a number of reasons. First, Koch did not raise this argument until its reply brief, and we will not address it absent some explanation by Koch for its failure to do so, which Koch has not provided. See Neb. Plastics, Inc. v. Holland Colors Americas, Inc., 408 F.3d 410, 421 n.5 (8th Cir. 2005) ("This Court does not consider issues first raised in a reply brief unless the appellant gives some reason for failing to raise and brief the issue in his opening brief."). Furthermore, even if we were to address Koch's contention, the allocation of the burden of proof on the application of an exclusion under Minnesota law dictates that it is Koch, not Great West, who must prove the applicability of section (a)(2) of the "trucker's" exclusion. Thus, Koch's attempt to shift the burden to Great West to disprove the applicability of the exclusion fails, and Koch's failure to offer any evidence establishing that Supreme/White did not procure insurance coverage for the trailer defeats Koch's argument with respect to section (a)(2). Finally, the record is devoid of any indication that this point is in dispute. Rather, Sirius has conceded that it is primarily liable for the damages caused by Supreme/White in the Kelly accident, and the record evinces no attempt by Sirius to divide that liability based on whether it stems from the tractor or the Koch trailer.

In addition, the cases Koch relies on in support of its contention that the "trucker" exclusion (with no reference to the specific sections of the exclusion) applies to Supreme/White, Rebick v. Home Indem. Co., 878 F.2d 382, 1989 WL 72927 (6th Cir. July 5, 1989) (unpublished) and Saffel v. Bamburg, 540 So.2d 988 (La. Ct. App. 1989), do not prescribe such a result. Though Rebick is factually analogous in that it involved an insurance policy with a similarly-worded "trucker"

exclusion and an accident with a leased tractor-trailer rig, 1989 WL 72927, at *1, the legal question was whether the lessor of the truck was primarily liable pursuant to policy. Id. at *7. Thus, the Sixth Circuit's determination that the lessor of the truck was not primarily liable has no bearing on the issue here, whether Great West has secondary liability for Supreme/White's fault in the Kelly accident as Sirius is undisputedly primarily responsible. See id. at *8. Saffel also involved an analogous "trucker" exclusion; however, it did not involve a "covered auto" because, though the driver involved in the accident did drive a tractor-trailer covered by the insurance policy at issue, he was not driving that vehicle at the time of the accident. 540 So.2d at 989-91. Accordingly, neither Rebick or Saffel stand for the proposition that the Policy's "trucker" exclusion excepts coverage for Supreme/White.

Finally, Koch contends that, because Supreme/White leased the trailer from Koch pursuant to a 24-month lease, the No-Fault Act renders Supreme/White the owner of the trailer for purposes of the Kelly accident regardless of the Policy's provisions. The No-Fault Act provides the following definition for an "owner":

> If a motor vehicle [including a trailer] is the subject of a lease having an initial term of six months or longer, the lessee shall be deemed the owner for the purposes of sections 65B.41 to 65B.71, and 169.09, subdivision 5a, notwithstanding the fact that the lessor retains title to the vehicle and notwithstanding the fact that the lessee may be the owner for the purposes of chapter 168A.

Minn. Stat. § 65B.43(4); see id. § 65B.43(2) ("'Motor vehicle' . . . includes a trailer with one or more wheels, when the trailer is connected to or being towed by a motor vehicle."). However, the impact of the No-Fault Act's definition of "owner" is limited to the Act's provisions and does not bear on the construction of an insurance contract for purposes of determining coverage. See U.S. Fire Ins. Co. v. Fireman's Fund Ins. Co., 461 N.W.2d 230, 234 (Minn. Ct. App. 1990) ("[T]he definition of 'owner' under [Minn. Stat. § 65B.43(4)] relates only to the provisions of the No-Fault Act. The intent of the [insurance] policy must be determined by the plain meaning of its

-13-

words."); see also Northland Ins. Co. v. Cont. W. Ins. Co., 550 N.W.2d 298, 302 (Minn. Ct. App. 1996) (stating that the No-Fault Act, which designates statutory owner of vehicle, would not be used to determine priority of coverage under commercial truckers' insurance policies). Thus, the No-Fault Act's definition of "owner" for its purposes does not trump the Policy's terms in determining coverage for the Kelly accident. Moreover, the Act's stated purpose is to address "[t]he detrimental impact of automobile accidents on uncompensated injured persons," Minn. Stat. § 65B.42, by "reliev[ing] the severe economic distress of uncompensated victims of automobile accidents . . . ." Id. § 65B.42(1). Accordingly, Koch's reliance on the No-Fault Act as a means of avoiding coverage for the Kelly accident is contrary to the Act's underlying policy.

In sum, Supreme/White, as permissible operators of Koch's trailer, a "covered auto," at the time the Kelly accident occurred, are insureds under the Policy. Further, Koch has failed to demonstrate that the "trucker's" exclusion applies to Supreme/White. Therefore, Great West was required to provide Supreme/White coverage under the Policy, and Koch is obligated to reimburse Great West in the amount of its Retention.

B.

Koch also claims that Great West breached the fiduciary duty it owed Koch by putting its own financial interests ahead of Koch's when, despite Koch's express objections and the recommendation of Great West's coverage counsel, it accepted coverage under the Policy and settled Ellefson's claim, triggering Koch's obligation under the Retention to pay Great West $500,000. Alternatively, Koch argues that genuine issues of material fact preclude summary judgment for Great West.

As a threshold matter, we note that there is some doubt that Koch has raised a breach of fiduciary duty claim; however, we, like the district court, proceed to the merits of such a claim, assuming that it was properly pled. Concerning Koch's

contention arising out of Great West's acceptance of coverage for the Kelly litigation, we reject this assertion in light of the preceding analysis's determination that Supreme/White were insureds under the Policy for purposes of the Kelly accident. We see no basis for finding a breach of fiduciary duty on the part of an insurer who accepts coverage for a claim covered by the insurance policy's terms. With respect to Koch's assertion that Great West accepted coverage despite Smetak's recommendation to the contrary, this is an inaccurate description of the record in this case where Smetak's opinion progressed over time to eventually express serious concern that the Policy did provide coverage. Moreover, by characterizing Great West's risk in declining coverage as a $3 million risk, Great West took into consideration the $500,000 Koch stood to lose such that Great West did not put its financial interests ahead of Koch's. See Short v. Dairyland Ins. Co., 334 N.W.2d 384, 387-88 (Minn. 1983) (holding that a liability insurer must exercise good faith in settling a claim within policy limits which "includes an obligation to view the situation as if there were no policy limits applicable to the claim, and to give equal consideration to the financial exposure of the insured"). Finally, despite Koch's assertion that it raised an express objection to the acceptance of coverage prior to Great West's acceptance, we see no *material* issue of fact as to this issue because, as previously stated, the Policy's terms required the acceptance of coverage for the Kelly accident.

With regard to the settlement of Ellefson's claims, the Policy provides that Great West "will settle or defend, as we consider appropriate, [any] claim or 'suit' asking for damages which are payable under the terms of this Coverage Form." Thus, based solely on the Policy's terms, Great West had the unfettered right to settle the Ellefson claims, despite the presence of the Retention. This principle has been affirmed by courts construing similarly-worded insurance contracts, see Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 836-38 (3d Cir. 1995) (holding that insured did not have a likelihood of prevailing on its claim that its liability insurer had no authority to make settlement because the policy expressly authorized insurer to settle suits it deemed appropriate such that if the insured wished to control

-15-

settlement of case, it should have purchased policy with that protection); <u>Cas. Ins. Co. v. Town & Country Pre-Sch. Nursery, Inc.</u>, 498 N.E.2d 1177, 1179 (Ill. App. Ct. 1986) ("The terms of the policy are clear and enforceable. [The insurer] had the right to settle the case within the policy limits and its duty of good faith, therefore, was not a material factual issue."), and even where, as here, the settlement at issue involved the commitment of the insured's own funds. <u>See</u> <u>United Capitol Ins. Co. v. Bartolotta's Fireworks Co., Inc.</u>, 546 N.W.2d 198, 200-01 (Wis. Ct. App. 1996) (determining that liability policy giving insurer "discretion" to settle claims made against insured did not require that insurer first obtain insured's consent, even though under terms of the retention endorsement the insured was responsible for first $25,000 of any settlement); <u>Orion Ins. Co., Ltd. v. Gen. Elec. Co.</u>, 493 N.Y.S.2d 397, 401 (N.Y. Sup. Ct. 1985) (concluding that where a policy gives an insurer the right to settle an action with or without the consent of the insured, the insurer may do so even though the insured's contribution in the form of the deductible is considerably larger than the insurer's contribution and the settlement is fully within the deductible at no cost to the insurer). However, the Policy must be interpreted in accordance with Minnesota law.

The Minnesota Supreme Court has held an insurer owes its insured a duty of good faith in settling a third-party claim that is within policy limits but requires the insured to pay a "retrospective premium." <u>Transp. Indem. Co. v. Dahlen Transp., Inc.</u>, 161 N.W.2d 546, 549 (Minn. 1968). In <u>Transp. Indem. Co.</u>, the insurer sued for additional premiums arising out of the settlement of claims under a retrospective premium policy, and the insured denied liability for the premiums because the insurer had acted unreasonably in settling the claims. <u>Id.</u> at 548. The insurer contended that its good faith could not be challenged because the policy provided that it had the right to make the sole and exclusive determination as to the appropriateness or propriety of amounts paid for losses or expenses and thus the reasonableness of the payment at issue. <u>Id.</u> The Supreme Court of Minnesota disagreed because, due to the retrospective premium, the insurer was, in effect, settling claims with the insured's money, creating an inherent conflict of interest that entitled the insured "to have the

-16-

insurer produce the information pertinent to the reasonableness and good faith of the settlement and assume the burden of proof on the issue." Id. at 549; see Transit Cas. Co. v. Topeka Transp. Co., Inc., 663 P.2d 308, 311 (Kan. Ct. App. 1983) (holding that, in insurer's action to recover retrospective premiums, the insurer had the burden of showing, as part of its case in chief, evidence of probable liability in each case it settled, as well as evidence that the amounts paid were reasonable) (citing Transp. Indem. Co., 161 N.W.2d at 549). Because the retrospective premiums at issue in Trans. Indem. Co. are analogous to the Retention in this case, the same inherent conflict of interest that the Supreme Court of Minnesota recognized in that case, exists here. Thus, Great West owed Koch a duty of good faith in settling claims, despite the contractual language providing Great West an unfettered right to settle, pursuant to Minnesota law.

However, Koch's challenges to the settlement of the Ellefson claims mirror those which we found insufficient with regard to Great West's acceptance of coverage for the Kelly accident. The appropriateness of the settlement is further demonstrated by the fact that it followed the jury verdict in the Kelly litigation which found Great West's insureds, Supreme and White, substantially at fault for the underlying accident. Thus, whatever the exact parameters of the duty of good faith Great West owed Koch in settling the Ellefson claims, Great West has not crossed them. Rather, Great West simply settled claims arising out of an accident covered by the Policy, and Koch makes no contention that the settlement amount was unreasonable or in any way improper. Accordingly, there are no questions of material fact precluding summary judgment, and Great West is entitled to judgment as a matter of law on the breach of fiduciary duty claim.

III.

For the foregoing reasons, the district court's decision is affirmed.

_____